SWAIN *v.* STATE OF INDIANA.

[No. 27,134. Filed February 9, 1939. Rehearing denied March 6, 1939.]

*R. L. Bailey, Tenola E. Graves* and *Rudolph D. O'Hara,* for appellant.

*Omer S. Jackson,* Attorney General, and *Rexell A. Boyd,* Deputy Attorney General, for the State.

SHAKE, J.—Appellant was indicted, tried, and convicted of murder in the first degree while in the perpetration of a robbery, and sentenced to death. He prosecuted an appeal to this court, which affirmed the case on June 7, 1938. *Swain* v. *State* (1938), 214 Ind. 412, 15 N. E. (2d) 381. Thereafter, he filed in the court below a petition for a writ of error *coram nobis.* The state answered by general denial; evidence was heard; and the petition was denied. The appellant has again appealed to this court.

The verified petition for a writ of error *coram nobis* recites that on or about November 27, 1937, appellant was arrested by police officers for the killing of one Christ Bredenkamp on the night of November 23rd of that year; that he was confined in jail and not permitted to see anyone until December 6th, upon which day he was arraigned and entered a plea of not guilty. Appellant says that he is a Negro and that at the time he entered his plea he was 18 years of age and without

education; that he had been unemployed for a long time and had slept in boxcars at night; that he had made an unsuccessful effort to obtain admission in a C. C. C. camp; that he had been compelled to forage for his food; that prior to his arraignment he had not consulted with any attorney; and that he entered his plea while unadvised as to his legal and constitutional rights. He says that he saw no lawyer until December 12th, six days after his arraignment, when attorney Edward Crabtree, being at the jail to see another prisoner, asked appellant if there was any insanity in his family, to which appellant responded "No," and that there was no other conversation between appellant and said attorney at said time; that he did not see said attorney again until the 14th day of December, on which day appellant was tried by a jury and convicted. Appellant says that prior to the commencement of said trial said attorney asked appellant if he wished his uncle to sit at the table with him, and that this was the only conversation between appellant and said attorney before said trial began.

Appellant predicates his right to a writ of error *coram nobis* upon three alleged facts, namely: (1) that he was of unsound mind at the time of the commission of the offense with which he was charged and at the time of his arraignment and trial; (2) that the grand jury which indicted him, and the petit jury before which he was tried, were unlawfully and illegally constituted in that members of the Negro race were arbitrarily excluded therefrom by the jury commissioners; and (3) that the jury commission, the grand jury, and petit jury were not duly qualified because the members thereof did not take an oath to support the Constitution of the United States. He says that he was denied his constitutional rights because he was required to plead and enter upon trial without counsel, and did so without

knowing that this would foreclose him from afterwards raising the above matters.

## 1.

At the hearing it was shown that Edward Crabtree was the duly appointed pauper attorney for the trial court. He testified that some time before the trial he had a conference with the appellant in the jail, but he was unable to state the date or how long it was before the trial began. He stated that he believed he discussed the case at another time before trial when he was at the jail to see another prisoner, but about this he was not positive. He admitted that he did not discuss the case with any of the defendant's relatives except an uncle, with whom he talked in the courtroom just before the trial began, and that he did not make any investigation of the circumstances surrounding appellant's written confession. He was not able to recall the conversation with the uncle, nor would he say that he talked with the appellant before arraignment, but he thinks he was in the courtroom at the time appellant entered his plea. Immediately prior to the trial the attorney was engaged in the defense of another criminal case, under private employment.

The record is silent as to any specific designation of the attorney to represent the appellant. It does not disclose that appellant was represented by counsel at the arraignment, or at any time prior to the commencement of the trial. It does appear that attorney Crabtree participated in the trial of the cause by cross-examining witnesses. No evidence was offered on behalf of appellant, nor did he testify; no instructions were tendered on his behalf, nor were any exceptions reserved to the instructions given. From the evidence as set out in the record it appears that the trial began about 2:00 o'clock in the afternoon of December 14th, and that a verdict

was rendered by the jury about 9:00 o'clock in the evening of the same day.

When the defendant in a criminal case desires to plead that he was of unsound mind at the time the offense charged was committed, he himself, or his counsel, must set up such a defense specially in writing, and the prosecuting attorney may reply thereto by a general denial. Section 9-1701 Burns 1933, §2215 Baldwin's 1934. A written plea of insanity, under the above section, need not be made at the arraignment, as is an oral plea of guilty or not guilty. *Barber* v. *State* (1925), 197 Ind. 88, 149 N. E. 896.

Any irregularity in the selection, impaneling, or swearing of a grand jury must be pleaded by abatement. *State* v. *Jackson* (1918), 187 Ind. 694, 121 N. E. 114; *Bottorff* v. *State* (1927), 199 Ind. 540, 156 N. E. 555. A plea to the merits of the charge, like a plea of not guilty, waives abatement. *Cooper* v. *State* (1889), 120 Ind. 377, 22 N. E. 320; *Moore* v. *State* (1925), 196 Ind. 299, 141 N. E. 638.

The record on the former appeal discloses that appellant was sentenced on December 15th, and that on December 17th Elmer Q. Lockyear, Theodore Lockyear, and Charles J. Eichel entered their appearances as attorneys for the appellant. Thereafter, on January 7, 1938, they filed in said cause, on behalf of the defendant, a motion for a new trial. The motion contained assignments to the effect that attorney Crabtree was negligent in the representation of the appellant by failing to give due consideration and attention to the case; that he did not properly investigate the evidence; that he did not prepare any instructions; that he did not make proper objections to the evidence; and that he failed to tender proper forms of verdicts. In passing upon this assignment in the motion for a new trial, this court said (p. 417):

"All of these assertions are merely unsworn statements. There is nothing in the record to show what investigation was made by Mr. Crabtree, nor what attention he gave to the case. . . . There was little that any attorney could do for the appellant in the trial of the case. . . . There was no conflict of any kind in the evidence and no reason in our judgment for criticism of Mr. Crabtree."

The petition for writ of error *coram nobis* can not be utilized to have a reconsideration of the matters determined by this court on the former appeal. The complaint that Mr. Crabtree was negligent and did not properly represent the appellant can therefore not now be considered. The motion for a new trial presented by the former appeal did not make any assignment to the effect that the appellant was of unsound mind at the time of the commission of the alleged offense, or that there were any irregularities with respect to the grand jury that returned the indictment, or the trial jury that heard the case. As to these assignments, now presented, the appellant says in his petition for *coram nobis:*

"Petitioner further says that he did not know his constitutional rights and has just recently been advised thereof and that as soon thereafter as is possible he is availing himself of the protection of his constitutional rights, nor was he advised that he was entitled to be represented by counsel of his own choice and to consult with him at every stage of the proceedings; that he was not given an opportunity to consult with counsel prior to entering his plea and prior to trial in order to plead understandingly and to prepare his defense; that the court did not inquire as to which means petitioner possessed by which he might employ a lawyer, and did not inform him that it was the duty of the court to appoint a lawyer to appear for him in case he possessed no means to employ one, nor that he might have the lawyer of his own choice."

It must be conceded, we think, that in a proper case *coram nobis* may afford a remedy for the relief of an

insane person who is convicted without that fact having been brought to the attention of the trial court, where the circumstances surrounding the case disclose that the defendant was prevented from having the issue raised and presented. Such is the intimation to be found in the case of *Sanders* v. *State* (1882), 85 Ind. 318. See also *Hawie* v. *State* (1919), 121 Miss. 197, 83 So. 158, 10 A. L. R. 205, and annotation appended thereto. The Supreme Court of Mississippi, in a subsequent decision, reconsidered the rules laid down in the Hawie case and substantially restricted the application thereof. We quote from *Mitchell* v. *State* (1937), 179 Miss. 814, 823, 824, 176 So. 743:

"Since the rendition of the opinions of the court in *Hawie* v. *State,* 121 Miss. 197, 83 So. 158, 10 A. L. R. 205, and Id., 125 Miss. 589, 88 So. 167, although the result reached in both those decisions was correct, the discussions made a part of those opinions have induced a course of practice in cases of death sentences which, under the experiences of the last few years, has become intolerable, and has produced such mischief as to bring the courts and the law into a measure of disrespect, in the hearing of numerous applications for the stay of executions and in the too frequent granting thereof. It may be asserted with confidence that during the last several years in the majority of cases in this state of convictions with the death penalty of persons with any means, or with relatives or friends who have means to employ additional counsel, the convict is asserted to be insane as soon as the hangman is seen to approach with his noose, and the more atrocious the crime, and the greater the ability of the convict to feign unusual symptoms, the more ready are some mental experts to attest a supposed insanity. See Zane, The Story of Law, pp. 346-350. We have reached the point where it becomes the solemn obligation of this court to close some of the doors to the field by which judgments of conviction with death sentences may be made footballs, to be tossed from court to court, and from one delay to another."

We do not find the subject to be as troublesome as suggested by the Supreme Court of Mississippi. It is the established rule of our practice that, insofar ■ as applicable, the sufficiency of a petition for a writ of error *coram nobis* and the sufficiency of the evidence that will sustain it are to be tested by the rules pertaining to motions for a new trial because of newly discovered evidence. *Hicks* v. *State* (1938), 213 Ind. 277, 11 N. E. (2d) 171, 12 N. E. (2d) 501. Admitting, without at this time conceding, that the issue as to appellant's unsoundness of mind was properly presented by his petition for a writ of error *coram nobis,* we are called upon to say whether the denial of the writ by the Vanderburgh Circuit Court should be reversed. The evidence offered on the hearing from which this appeal is prosecuted, and relating to the subject of appellant's insanity, revolves about the testimony of a single witness. Samuel Swain, appellant's uncle, testified that the appellant's maternal grandmother was confined to an insane asylum some thirty years ago; that appellant's father was somewhat "unbalanced" and "kind of flighty at different times" for the past twenty-eight years; and that one of appellant's brothers was also at times "flighty and unbalanced." The testimony of this witness as to the mental condition of the appellant is brief and we quote in full:

"Q. Are you acquainted with the mental condition of James Reed Swain?
A. I am.
Q. You may tell the Court what that condition was during the time you knew him.
A. He stayed with me and my wife for about eighteen months and we tried to provide for him, and I would talk to him what to do and how to do it, and it looked like he would fly off and go crazy at times and then he would come back and make an apology.
Q. Would you say at times he was sane or insane?

A. Insane at times.

Q. Do you know his mental condition about the time of Thanksgiving, the 23rd of November, 1937, about the time Bredenkamp was killed?

A. Well, yes, sir.

Q. Well, what would you say his condition was at that time as to whether he was sane or insane?

A. Well, he came by home and I just called him plain crazy. He would come by home and wanted to go to the show and wanted clothes and money.

MR. R. L. BAILEY: Read the question please.

Q. (Reporter reading): Well, what would you say his condition was at that time as to whether he was sane or insane?

A. I would say he was partly insane."

It is not every slight aberration of the mind, nor every case of slight mental derangement, that will excuse a person for the commission of an act in violation of the law. Where there is mental capacity sufficient to fully comprehend the nature and consequences of the act, and unimpaired will power strong enough to master an impulse to commit crime, there is criminal responsibility. *Goodwin* v. *State* (1884), 96 Ind. 550.

It is clear that if the issue as to appellant's alleged insanity had been properly and timely raised as newly discovered evidence by a motion for a new trial, and if the matter had been determined adversely to the appellant in that manner, this court would not be at liberty to disturb the denial of a new trial. The evidence, fully set out above, falls far short of measuring up to that degree of proof required to sustain a petition for relief by way of newly discovered evidence. By the same standards, we are obliged to hold that there was no such showing of the appellant's mental irresponsibility at the *coram nobis* hearing as would warrant us in reversing the trial court which denied the petition on that ground.

## 2.

The Supreme Court of the United States has said that:

"Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States." *Carter* v. *Texas* (1900), 177 U. S. 442, 447, 44 L. Ed. 839, 20 S. Ct. 687.

The principle stated is equally applicable to a similar exclusion of negroes from service on petit juries. *Strauder* v. *West Virginia* (1879), 100 U. S. 303, 25 L. Ed. 664. The same right is guaranteed by section 13 of article 1 of the Constitution of Indiana:

"In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed."

The General Assembly has endeavored to make this constitutional protection effective by prescribing the oath that jury commissioners shall assume. It is:

"You do solemnly swear (or affirm) that you will honestly, and without favor or prejudice, perform the duties of jury commissioners during your term of office, that, in selecting persons to be drawn as jurors, you will select none but persons whom you believe to be of good repute for intelligence and honesty, that you will select none whom you have been or may be requested to select, and that, in all of your selections, you will endeavor to promote only the impartial administration of justice." §4-3301 Burns 1933.

The guaranty is further protected by the statutory provision defining the duties of jury commissioners.

They are to select the names of jurors "from the names of legal voters and citizens of the United States on the tax duplicate of the county for the current year . . . as nearly as may be, in equal numbers from each county commissioner's district." §4-3304 Burns 1933.

We do not find that this court has been called upon to consider discrimination in the selection of jurors on account of race or color, but it has had before it the question of such discrimination as applied to sex. In *Walter* v. *State* (1935), 208 Ind. 231, 237, 195 N. E. 268, this court reversed a case because jury commissioners had intentionally and arbitrarily excluded women. In discussing the subject, Fansler, J., speaking for this court, said:

> "This right may not legally be denied, and if it is denied we must presume that the defendant was prejudiced thereby. Any other rule would permit the jury commissioners, upon their own agreement, or upon suggestion, to exclude any class not only upon the basis of sex, but because of political affiliation, religious belief, ancestry, occupation, or location of residence, and we can see nothing that would prevent the exclusion of not only one, but numerous classes from jury service. This does not mean that all classes must be represented among the jurors selected. It does mean that the jury commissioners must exercise their own judgment and discretion in selecting the names, and that in making the selection they may not arbitrarily refuse to consider any class or classes of persons."

The Supreme Court of the United States has recently decided two cases in which the arbitrary exclusion of negroes from jury service was fully considered. In *Norris* v. *Alabama* (1935), 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074, that court reversed a conviction for rape because of the arbitrary exclusion of negroes from the grand jury that indicted, and the petit jury that tried the defendant. The case arose in Jackson County, Alabama, and it was disclosed by the evidence that according to

the 1930 census the total population of the county was 36,881, of which 2,688 were negroes. The male population over 21 years of age numbered 8,801, and of these 666 were negroes. Persons ranging in age from 50 to 76 years who had lived in the community all their lives testified that no negro had served on any grand or petit jury in the county within their memories. The jury commissioners denied that they had wilfully or arbitrary excluded negroes from the jury lists, but one member of that body testified as follows (pp. 598, 599):

> "I do not know of any negro in Morgan County over twenty-one and under sixty-five who is generally reputed to be honest and intelligent and who is esteemed in the community for his integrity, good character and sound judgment, who is not an habitual drunkard, who isn't afflicted with a permanent disease or physical weakness which would render him unfit to discharge the duties of a juror, and who can read English, and who has never been convicted of a crime involving moral turpitude."

The evidence to the contrary clearly showed that there were many negroes of intelligence, including business men, owners of real property, and householders in the community, among them nearly 200 college graduates, who were eligible for jury service. It also appeared from the evidence that after the jury lists for 1930-1931 had been compiled some unknown person placed a red line through the names of six potential jurors, and that the names of six negroes were written immediately above the red lines. This was apparently the corrupt act of someone to make the record falsely reflect that there had been no discrimination. The original jury roll was produced at the bar of the United States Supreme Court. Speaking for the court, Chief Justice Hughes said (pp. 596, 597):

> "We are of the opinion that the evidence required a different result from that reached in the state court. We think that the evidence that for a gen-

eration or longer no negro had been called for service on any jury in Jackson County, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids. . . . For this long-continued, unvarying, and wholesale exclusion of negroes from jury service we find no justification consistent with the constitutional mandate."

In *Hale* v. *Commonwealth of Kentucky* (1938), 303 U. S. 613, 58 S. Ct. 753, 82 L. Ed. 1050, the Supreme Court, by a per curiam opinion, reversed a judgment of the Court of Appeals of Kentucky which had affirmed the conviction of a negro for murder. The case arose in McCracken County, and the undisputed evidence disclosed that the county had a population of 48,000, of which 8,000 were negroes; that the assessor's books, from which jury lists were compiled, contained the names of 6,000 white persons and 700 negroes qualified for jury service under the statute; that in 1936 the jury commissioners filled the wheel for jury service with some 500 or 600 names, all of which were those of white persons. It was further established that in 50 years no negro had been drawn for jury service in the county. In the course of its opinion the court said (p. 616):

"We are of the opinion that the affidavits, which by the stipulation of the State were to be taken as proof, and were uncontroverted, sufficed to show a systematic and arbitrary exclusion of negroes from the jury lists solely because of their race or color, constituting a denial of the equal protection of the laws guaranteed to petitioner by the Fourteenth Amendment."

The above recent expressions by the highest court in

the land provide the yardstick by which this court, bound by the oaths of its members to support the Constitution of the United States, is required to determine whether the appellant's right have been denied him.

Two physicians, a teacher, a retired teacher, and a lawyer made affidavits that they had resided in Evansville for periods ranging from 12 to 60 years; that it had been the practice over a long period of time to exclude negroes from jury service in said county; and that there were hundreds of intelligent adult negroes in "the city of Evansville alone" who possessed the necessary qualifications for jury service. It was further shown that approximately 50 per cent of the negro inhabitants of Evansville paid personal property taxes, and that some 10 or 12 per cent thereof paid taxes on real estate. Three or four colored lawyers, four or five colored doctors, and between forty and fifty colored school teachers follow their professions in the county. There was evidence as to the approximate population of the county and county seat, both with respect to white and colored inhabitants, but we prefer to take the figures disclosed by the last available United States census, which we are at liberty to judicially notice. These statistics show the total population of the county in 1930 was 113,320, of which 7,228 were negroes; and that the population of Evansville was 102,249, of which 6,514 were negroes.

It is unsafe, we think, to attach too much significance to abstract mathematical ratios, or to the so-called law of recurrences in determining whether there has been arbitrary discrimination in the selection of the juries. Most of the appellant's evidence related to the availability of eligible negroes in the city of Evansville, and it is true that according to the figures stated above the population of that city is approximately 6 per cent negro. But we must not lose

sight of the provision of the statute heretofore cited, which is to the effect that jury lists shall be made up, as nearly as may be, in equal numbers from each county commissioner's district. If the jury commissioners observed this provision of the statute, as we must presume they did, the possibility of a negro residing in the city of Evansville being drawn for jury service was reduced one-third, or to approximately 2 per cent, which is one in fifty. The fact that no negro was drawn on appellant's jury is therefore not, within itself, conclusive that there was discrimination.

The law requires that jury lists shall be compiled from the county tax duplicates. These records do not disclose the age or the color of the taxpayer. The schedules in the assessor's office have blank spaces thereon for entering this information, but it appears from the evidence that the color of the taxpayer was not always noted on these schedules. What number or percentage of the schedules disclosed this information was not shown. The jury commissioners of Vanderburgh County had access to these records and used them in the discharge of their duties, but it is not made to appear that such use had any relation to the alleged discrimination against negroes. One jury commissioner testified, and he denied, positively, that there was any discrimination; the judge of the Probate Court from 1929 to 1933 said that three colored jurors were regularly drawn in that court during his term; the judge of the Superior Court, who had been in office since 1931, stated that one negro was drawn on a jury in his court some four years previous. The evidence does not establish that clear showing of error of fact that would justify us in disturbing the exercise of the trial court's discretion. *Quinn* v. *State* (1936), 209 Ind. 316, 198 N. E. 70.

We have already pointed out that Messrs. Lockyear,

Lockyear, and Eichel appeared as attorneys for appellant in the original action in the court below on December 17, 1937. This was but two days after appellant was convicted, and the statute allowed thirty days from judgment for the filing of a motion for a new trial. Such motion was filed by said attorneys on January 7th following. There is no claim in the petition for *coram nobis* that these attorneys were negligent in representing the appellant or that they were not advised as to the facts set out in the petition in time to have embraced them in the motion for a new trial. Neither is there any claim that said attorneys were not skilled and competent. As to one of them—Honorable Elmer Q. Lockyear—this court knows that he served for four years on the bench of the Appellate Court of Indiana, and was, prior thereto, Probate Judge of Vanderburgh County. It is not to be presumed that said attorneys were not fully informed as to the facts with reference to the alleged racial discrimination set out in appellant's petition. These facts, by reason of their nature, were neither concealed nor capable of concealment. Such as they were, they must have been known to lawyers practicing in the courts of the county. Nor is it reasonable to presume that said attorneys were derelict in ascertaining appellant's mental condition before they filed his motion for a new trial. All of these circumstances go far to establish that appellant did not exercise that degree of diligence required of one seeking relief by way of *coram nobis,* as to matters that might and should have been presented by a motion for a new trial. In *Sanchez* v. *State* (1927), 199 Ind. 235, 157 N. E. 1, this court specifically held that a defendant who was deprived of substantive rights on account of inadequate representation by counsel at his trial might, nevertheless, protect his rights by proper assignments in a motion for a new trial.

### 3.

The complaint that the jury commissioners, the grand jurors, and the members of the trial jury were not legally qualified because they did not take oaths ▉ to support the Constitution of the United States can not be sustained. This court has decided that such oaths are not required. *Foreman* v. *State* (1938), 214 Ind. 79, 14 N. E. (2d) 546; *Adams* v. *State* (1938), 214 Ind. 603, 17 N. E. (2d) 84.

Mindful as we are of the responsibility that rests upon this court to see that appellant is not denied his constitutional rights, we do not find reversible error in the record.

Judgment affirmed.