Argued June 17; reargued September 8; affirmed November 10; rehearing denied December 22, 1942

# STATE *v.* WALLACE

(131 P. (2d) 222)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Leroy L. Lomax*, of Portland, for appellant.

*Clarence A. Potts*, Deputy District Attorney, and *James R. Bain*, District Attorney, both of Portland, for respondent.

BRAND, J. On the 8th day of August, 1941, defendant fatally shot Benjamin H. Finkell. To the charge of murder in the first degree the defendant entered a plea of not guilty.

The Oregon statute provides:

"All matters of fact tending to establish a defense to the charge in the indictment or information, other than those specified in the third subdivision of section 26-841, and except as herein provided, may be given in evidence under the plea of not guilty; provided, however, that where the defendant pleads not guilty and purposes to show in evi-

dence that he was insane or mentally defective at the time of the alleged commission of the act charged, he shall, at the time he pleads, file a written notice of his purpose; and provided further, that the defendant may file such notice at any time thereafter but before trial when just cause for failure to file the same at the time of making his plea shall be made to appear to the satisfaction of the court. If the defendant fails to file any such notice he shall not be entitled to introduce evidence for the establishment of such insanity or mental defect; provided, however, that the court may, in its discretion, permit such evidence to be introduced where just cause for failure to file the notice has been made to appear." O. C. L. A. 26-846.

The provision concerning notice of insanity was added in the year 1937 and has, until now, received no construction by this court.

The defendant did not, at any time before trial, file or seek permission to file any notice of purpose to show in evidence that he was insane or mentally defective at the time of the alleged commission of the act charged.

Upon this appeal, the defendant presents two assignments of error. The first is as follows:

"Upon the opening statement to the jury by James R. Bain, District Attorney, it appeared affirmatively and conclusively that the defendant was insane at the time of the commission of the alleged crime. That upon conclusion of the District Attorney's opening statement, counsel for the defendant moved the court to allow the defendant to add to his plea of Not Guilty, a plea of insanity as an excuse for his acts, which motion was over ruled by the Court and an exception taken to the Court's ruling and duly allowed by the Court. That the Court erred in over ruling the defendant's motion

and the Court's act constituted an abuse of the Court's discretion."

The second assignment of error is as follows:

"That during the trial of the State's case, numerous State's witnesses testified to acts and appearances of the defendant that showed clearly that the defendant was insane at the time of the alleged commission of the offense with which he was charged and after the testimony was adduced from the witnesses many motions were made to the trial Court upon behalf of the defendant to allow the defendant to offer as a defense and excuse for his act, the plea of insanity, which motions were denied by the Court and the Court's denial constituted an abuse of the Court's discretion."

The only substantial difference between the two assignments is that one relates to matters disclosed by the district attorney in his opening statement, and the other to the same matters disclosed by the state's witnesses.

At the close of the trial, the defendant requested a brief instruction on insanity as a defense, which was denied by the court and an exception allowed. In view of the gravity of the case, we have considered the propriety of this ruling, although no error based upon it has been assigned in the brief.

In his opening statement concerning the conduct of the defendant on the day of the shooting, the District Attorney said:

"Wallace, the defendant, went into the Olympian, and he met Mr. Scheurer—Mr. Scheurer the pan dealer, and he says, 'I am going to get me some white meat, I don't care a damn who it is, but I am going to get some.' And when Scheurer finished the deal he says, 'Where is your friend?' And Scheurer says, 'They are all my friends.' And Wal-

lace said, 'I mean your friend Buster Keating.' And he pressed the gun so hard against Scheurer that it left an impression on his body where he pressed the gun against him.''

At the conclusion of the opening statement by the District Attorney, counsel for the defendant interposed the following motion:

"Mr. Elliott: If the court please, there has been no surprise to the defense at all as to the statement made by the District Attorney, except in one or two particulars, and in view of the statement made by Mr. Bain, and the intention of the State to prove the things they intend to prove, counsel and myself feel that it is necessary to ask the Court, as provided by the Code, to introduce the plea of insanity for the defendant. The District Attorney may now object because of the failure to serve the District Attorney with notice at the time of pleading to the indictment. From the statements made by the District Attorney some of the statements made by the District Attorney, can be explained only by the defendant through evidence offered as insanity. We ask the Court to exercise its discretion at this time and permit us to introduce testimony of that nature.''

The District Attorney opposed the motion, and the court and counsel retired to the court's chambers, where the following conversation was had:

"The Court: Did you have something to say Mr. Elliott before I conclude?

"Mr. Elliott: Yes. The only opportunity we wish in the trial is not to be curbed in any way on the introduction of evidence that we have now to controvert evidence that the District Attorney has to offer. Some of the evidence that the District Attorney apparently anticipates can be controverted only by testimony that we intend to introduce

through our witnesses and on cross-examination of the State's witnesses to the effect that this defendant a short time prior to the incident, and a short time subsequent to the incident must have been insane—to prove his insanity. We can't explain these actions any other way. A sane man can't perform those actions, if the District Attorney is able to prove them."

"Mr. Lomax: This is the first I heard of him saying that he was going to shoot all his friends.

"Mr. Bain: That is what he said, 'I am going to shoot all my friends.'

"Mr. Lomax: And 'I am going to get some white meat' that is the first time I ever heard of that."

The fact is that the District Attorney never stated to the jury that the defendant had said, "I am going to shoot all of my friends," nor did any witness testify to the making of any such statement by the defendant. The only statement to that effect was made in the judge's chambers, and the District Attorney later in the same place corrected his statement and eliminated his assertion that the defendant had said he would kill all of his friends.

At the close of the conference in the judge's chambers, the court denied the defendant's motion. At the conclusion of the state's case in chief, counsel for the defendant addressed the court thus:

"Mr. Lomax: I am renewing the motion to allow us to include as a defense for the defendant the plea of Not Guilty by reason of the temporary insanity of the defendant."

This motion was also denied.

We then turn to the evidence presented by the state and which the defendant now claims established

his insanity at the time of the killing. Witness Scheurer testified:

"Q At the time he came in and put that gun on you and looked at him was you sure that he was in a normal state or was there something wrong with him?

"A There must have been something wrong with him, he looked mean and he went purple around the mouth and then he went white.

"Q He went purple and then he went white around the mouth?

"A Yes.

"Q Was he trembling?

"A No, I didn't notice he was.

"Q Did his voice sound sane at that time like it always sounded before?

"A Well, I really couldn't say.

"Q But his appearance was altered considerably, is that right?

"A Yes."

James Winslow testified:

"Q How did his (Wallace's) face appear?

"A Oh, his eyes were kind of blood shot and glassy, and he was kind of fighting those fellows off that was holding him."

James Wood testified:

"Q Was his (Wallace's) face drawn?

"A Yes, rather drawn, and you might say almost contorted with anger."

Officer Mitola testified:

"A When I walked into the room where he was seated, Detective Brian was with him. As soon as I walked into the room he seemed very angry, and he used profanity toward me, and I couldn't understand why, because I had not talked to him prior to that time, and then for a few moments later on we

did not bother talking to him—until he had a chance to cool off a little bit, and finally when he had straightened out to a certain extent we started questioning him about this incident, and his story— he was going to tell us the whole thing, and he related a story about an incident that occurred several years ago, several years back, in which his brother was involved in a fight in a card room, and a party by the name of Blondie Keating was one of the men involved in this incident, and there were two other fellows which resulted in the defendant's brother's death. That is the story he told us at the time; and the night previous to the shooting he had been in a card room at Kelly's Olympian on Washington Street, between Fifth and Sixth Streets, and he had been in a card game, and one of these Keatings—and we found later he meant Buster Keating—was in the card game; and so he told us he became involved in an argument with Keating, and Keating became quite abusive, and so he left the card room. And the next day he got to thinking about this argument, and also about the incident that occurred several years back, and he got to drinking, and the more he thought about it the madder he got, and the more he drank. And he thought he would go out and look for Keating. And before doing this he went up to his room and had some drinks there, and he had a gun in his room, which we found out was a .38 super-automatic. He took this gun to the basement of the hotel in which he was staying and practiced with that two or three times, and the gun jammed on him, so he took it to Semler's Pawn Shop on Southwest Third and Washington Streets and traded the gun for the gun we have here, and he then went back to the hotel and used that again in the basement to see if it worked, and after doing this he put the gun in his pocket, and stated he walked up the street, and was looking for one of the Keatings. And during the afternoon of this particular day he stated he had

been drinking and going into doorways, and had been in the Basket Grocery and purchased a bottle of wine, and had that and he had a few glasses of beer, and walking down the street in front of the Knotty Pine, he stated the deceased, Finkell, jumped out of the car, although he didn't know it was Finkell at the time, and he just shot.''

The foregoing testimony related to conversations had at the police station on the day of the killing. The same witness testified that the defendant's face was more or less flushed, that he thought defendant's statements were ''pretty logical'', but that he was ''more or less irrational.'' There was also testimony that on the day of the killing, the defendant claimed that some time previously, one Keating had attacked the defendant's brother, resulting in the brother's death, and that Keating had placed defendant's sister in a house of prostitution. At the trial, defendant testified that he had never had any trouble with Keating, that he had never heard of his brother having any such trouble and that none of his sisters was ever in a house of ill fame.

Shortly before and after the killing, the defendant used profane and obscene language. Concerning the evidence immediately preceding the killing, witness Scheurer testified:

''Mr. Lomax: Was that the first time?

''The witness: No, the second time. He came in and he come up to me and he says, 'Where is your friend?' and I says, 'What do you mean?' I call him Curley.

''Q Who do you call Curley?

''A Mr. Wallace. And he says, 'Where is your friend?' And I says, 'Who do you mean?' And he says, 'You know who I mean.' And he says, 'Your friend.' And I says, 'Well, Curley, there are lots

of them, everybody who comes in this place is my friend.' And he says, 'Well, your friend Buster.' And I says, 'I don't know.' And he started to call me vile names.

"Q  Tell the jury what he said and what he did. I know it is unpleasant, go ahead and tell the jury what he said.

"A  Well he called me a — — — do I have to use that—?

"Q  You will have to tell the jury what it is.

"A  Well he called me a dirty * * * * * and a son-of-a-bitch. And about that time he pulled a gun out and shoved it in my chest.

"Q  What did he say when he did that?

"A  Well, if I remember right he said, 'I would just as leave get you as my meat as not.'

"Q  Then what?

"A  Then after he put the gun in my chest,—I don't know whether he meant to pull the trigger or not, but I know it scared me at the time; and then he shoved the gun back in his pocket and started to walk out, and then he turned around and called me a dirty * * * * * again and walked out."

Detective McCormick testified:

"Q  And he (Wallace) said the police protected the pimps?

"A  Yes, he said the police protected the pimps.

"Q  And was there any continuity to what he said or was it all a mix up.

"A  It was all a mix up.

"Q  Could you get any sense out of it.

"A  Very little.

"Q  Was he drunk?

"A  I would say so.

"Q  When you talked to Mr. Bain did you tell him that.

"A  I did."

It should be added that there was ample evidence that the defendant was very drunk on the day of the killing. To this evidence we shall later refer.

It is the contention of the defendant that the trial court abused its discretion in refusing to permit the defendant after the commencement of the trial to add to his plea of not guilty the plea of insanity as a defense and excuse for his act. This special plea of not guilty by reason of insanity is unknown to our law, and defendant's motions were ineptly phrased, but we shall assume, for the purposes of this decision that the defendant meant to and did move the court for leave to introduce evidence of insanity under the provisions of the last clause of O. C. L. A. 26-846 (supra).

It is contended in support of defendant's appeal that the state introduced evidence of defendant's insanity and that therefore the insanity defense should have been submitted to the jury, notwithstanding the provisions of the statute. It is contended further that the defendant was entitled to introduce evidence of insanity notwithstanding the provision of the statute, and it has been urged that even if the defendant was not entitled to introduce evidence of insanity as a defense, nevertheless he was entitled to introduce such evidence for the purpose of showing an absence of deliberation, premeditation and specific intent, and for the further purpose of aiding the jury in determining the punishment, whether death or life imprisonment. No affidavit or testimony was ever made or given for the purpose of showing just cause for the failure to file the required notice. If any just cause can be found for such failure it must repose only in the unsworn statements of counsel for the defense concerning their ignorance of certain words and conduct of

the defendant on the day of the killing, as disclosed by the District Attorney's opening statement, and by the testimony of the witnesses for the state.

■ A consideration of the statute, O. C. L. A. 26-846 (supra), discloses that it is a limitation only upon the defendant.

> "* * * Where the defendant * * * purposes to show * * * that he was insane * * * he shall * * * file a written notice of his purpose * * * . If the defendant fails to file any such notice, he shall not be entitled to introduce evidence * * *."

The statute has no direct bearing on a case in which the state introduces evidence sufficient to go to the jury on the issue of insanity and to require an instruction thereon. Our first question, then, is whether in this case, irrespective of the O. C. L. A. 26-846, the *state* introduced sufficient evidence to require an instruction by the court on insanity as a defense and a submission of that question to the jury on proper forms of verdict. If there was such evidence, then the judgment of conviction must be reversed. If there was not, then we must inquire whether the court abused its discretion in refusing to permit the *defendant* to introduce "evidence for the establishment of such insanity or mental defect."

■ Upon the first question, the statement of the District Attorney, much of which was not in the presence of the jury, was not evidence, and if unsupported by evidence, it would certainly not require the submission of the insanity defense to the jury.

■ We come to the testimony. At the threshold of inquiry, one concession must be made, which on superficial consideration would tend to support the defendant's contention. When the insanity issue is

properly before the court, any and all conduct of the defendant and the relevant circumstances surrounding such conduct are admissible on the issue of insanity, and the only exclusionary rule must be based upon the power of the court in its discretion to exclude remote evidence in order to confine the trial within reasonable limits.

"The mode of operation of the mind is ascertainable from the conduct of the person in question, i. e. from the effect produced by his surroundings on his mind when responding by action to those surroundings. Virtually, then, the mind is one, while the surroundings are multifold; and the mode of operation cannot be ascertained to be normal or abnormal except by watching the effects through a multifold series of causes. On the one hand, no single act can be of itself decisive; while on the other hand, any act whatever may be significant to some extent.

"The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patteson, in a celebrated case, 'as to the principle on which such evidence is admissible: Every act of the party's life is relevant to the issue.' There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; *some* inference is always possible." Wigmore on Evidence, Vol. I. p. 9, § 288.

*State v. Driggers*, 84 S. C. 526, 66 S. E. 1042, 137 Am. St. Rep. 855, 19 Ann. Cas. 1166 (1909) ; *State v. Flanney*, 61 Wash. 482, 112 P. 630 (1911) ; *State v. Peare*,

113 Or. 441, to pages 447 and 448, 233 P. 256 (1915);
Weihofen, Insanity as a Defense in Criminal Law, page
238, and many cases cited.

In the case at bar, we concede that the state's case
did contain evidence concerning specific acts of the
defendant which would be admissible in support of an
insanity defense. This presents a fundamental ques-
tion: Is it the duty of the court to submit the issue of
insanity as a defense whenever specific instances of
strange, irrational or depraved conduct are made to
appear in the state's evidence? The answer is "no."
If it were otherwise, it would be necessary to instruct
on the insanity defense and submit that issue by special
form of verdict in substantially every murder case and
innumerable other cases, for which there is no justifi-
cation in theory, practice or precedent. Under the rule
of multiple admissibility, I Wigmore, 3rd Ed. § 13, it
seems clear that evidence which is clearly admissible
for one purpose should not necessarily, when offered
for that purpose, be deemed to raise all other issues
which might be supported by such evidence. Upon a
murder charge the state may have the burden of proof
of premeditation, deliberation, malice and intent to
kill. Evidence on any of those issues may disclose that
the defendant employed profane and indecent lan-
guage, unreasonable and unjustified jealousy, passion,
frenzy or blood-lust. In proof of the act of killing, con-
temporaneous statements and conduct of the defendant
would be admissible. Such conduct may disclose
brutality, depravity or revenge on the part of the
defendant. Statements of the defendant after the crime
may be, and frequently are, inconsistent with the facts
and with each other. They frequently manifest real or
simulated failure of memory. Evidence of other strange
and illogical acts may be relevant to show conscious-

ness of guilt, and in multitudes of cases admissible evidence may show that the defendant was intoxicated and manifested one or more symptoms which are characteristic both of insanity and intoxication. If any evidence of any of the types above referred to, when offered by the state, should be held to require the submission of the insanity defense, the result would be disastrous in the practical administration of criminal law.

■ The question as to when the insanity defense should be submitted to the jury must be considered in the light of the law of the particular jurisdiction concerning that defense. Approximately one-half of the states of the union have adopted the rule that the burden of proof is on the state to prove the defendant sufficiently sane to be held responsible. Weihofen (supra), pages 150 and 172. In such jurisdictions, the state can rely only on the presumption of sanity as perhaps relieving it of the affirmative duty of introducing evidence of sanity in the first instance. In such states, it might be suggested that any substantial evidence of irrational conduct would be sufficient to sweep aside the tenuous presumption of sanity and impose upon the court the burden of instructing on that issue. 22 C. J. S. page 889, § 576. Decisions from states where such rules prevail are of little or no aid in this jurisdiction, for Oregon is one of twenty-two states which have adopted the rule that the burden of proof of insanity as a defense is upon the defendant, under which insanity becomes an affirmative defense. Weihofen (supra), p. 148. Not only is the burden of proof of insanity upon the defendant, but Oregon is the only state in the Union in which that affirmative defense must be proved by the defendant beyond reasonable doubt. *State v. Hansen*, 25 Or. 391, 35 P. 976, 36 P. 296;

*State v. Riley,* 147 Or. 89, 30 P. (2d) 1041. It is not for this court to nullify that rule, as it is established by valid legislative enactment. (O. C. L. A. 26-929.)

Nor can we constitute ourselves a psychiatric board to explore the hidden mysteries of the mind. Difficult as it is, the task of the courts is a simpler one than that of the alienist. The conflict between psychiatry and law has been too long a battle of words, the former giving to "insanity" a broad and profoundly penetrating meaning as a result of techniques unknown and largely unknowable to the law; the latter giving the same word a very much narrower meaning. It is time for a realistic approach. Since mental capacity when put in issue must for constitutional reasons be decided by a lay jury under the guidance of a judge, learned in the law but not presumed to be learned in psychiatry, the court cannot explore the whole field of the diseased mind, but rather limits itself to the difficult application of the rules for the determination of "responsibility." To that end, it has adopted crude definitions of so-called legal insanity, which in fact merely define "responsibility" before the law.

The Oregon court, by Mr. Justice McBRIDE, quotes with approval from *State v. Knight,* 95 Me. 467, 50 Atl. 276, 55 L. R. A. 373, the following:

"Although not a test of insanity, the knowledge of right and wrong is a test of responsibility. * * * Any individual having the capacity to know that an act which he contemplates is contrary to law should be deemed legally responsible, and should suffer punishment. He possesses what is called by Bain punishability." *State v. Hassing,* 60 Or. 81, 118 P. 195 (1911); 22 C. J. S. 121 § 58.

■ The test for determining legal responsibility (or punishability) is variously stated, but in substance it

is as follows: If, at the time of committing an act, the party was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know the nature and quality thereof, that he did not know that he was doing what was wrong, he should not be held responsible under the criminal law. M'Naghten's Case, 10 Clark & Fin. 200 (1843); *State v. Murray*, 11 Or. 413, 5 P. 55; *State v. Zorn*, 22 Or. 591, 30 P. 317 (1892); *State v. Lauth*, 46 Or. 342, 80 P. 660, 114 Am. St. Rep. 873 (1905); *State v. Brumfield*, 104 Or. 506, 209 P. 120 (1922); *State v. Butchek*, 121 Or. 141, 253 P. 367, 254 P. 805 (1927); *State v. Riley* (supra); *State v. Banks*, 147 Or. 157, 32 P. (2d) 571 (1934). In a word, the state is committed to the "right and wrong test."

■ The law has gone further in imposing specific limitations to the field of irresponsible insanity.

"While the law will not punish a man for an act which is the result of, or produced by, mental weakness, it will punish him for an unlawful act, not the result of, or produced or influenced, by mental disease, even though some mental unsoundness is shown to have existed." *State v. Branton*, 33 Or. 533, at p. 549, 56 P. 267 (1899).

"If the jury in this case had found that the appellant, at the time he shot Jenke, was not of sound mind; that he was laboring under a delusion; that it was the efficient cause of his doing the act; and that he would not have done it but for the delusion, it would not necessarily have followed that he should have been acquitted. He still may have been conscious that he was doing a criminal act that would subject him to punishment. If he knew enough to know that he was violating the law by the commission of the act, it will not excuse him, although he had surrendered his judgment to some mad passion which for the time being was exercising a

strong influence over his conduct." *State v. Murray* (supra).

"A frenzy arising from jealousy, in a mind unimpaired by disease and not unbalanced by heredity, is not insanity, within the meaning of the Code: State v. Lauth, 46 Or. 342 (80 Pac. 660, 114 Am. St. Rep. 873)." *State v. Butchek,* (supra).

■ The irresistible impulse doctrine has been definitely rejected, and that type of mental derangement does not relieve the actor from responsibility. *State v. Hassing,* 60 Or. 81, 118 P. 195 (1911) ; *State v. Grayson,* 126 Or. 560 at p. 575, 270 P. 404 (1928) ; *State v. Riley,* (supra). The rejection of the irresistible impulse doctrine and the adoption of the right and wrong test is supported not only by judicial decision, but also by legislative enactment.

"Morbid propensity to commit prohibited acts, existing in the mind of a person, who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor." O. C. L. A. 23-122.

■ The most pertinent limitation to the scope of the field within which the defendant is held irresponsible by reason of mental disease relates to intoxication. Mental incapacity produced by voluntary immediate intoxication and existing only temporarily at the time of the commission of the criminal act, is no defense, and this is true even though such intoxication produces mental derangement. 22 C. J. S. 135, § 70; *People v. DeMoss,* 4 Cal. (2d) 469, 50 P. (2d) 1031 (1935).

In the case of *State v. Trapp,* 56 Or. 588, 109 P. 1094, the court made certain rulings,

"* * * which rulings, as defendant insists, were to the effect that if defendant was voluntarily intoxicated regardless of whether the result was a

diseased condition of his mind, rendering him incapable of knowing the difference between right and wrong, nevertheless the jury must find him guilty of murder in the second degree, if they found him guilty at all.''

It was held on appeal that no error had been committed by the trial court, and this court said:

"It seems that, although drinking probably to excess, he was going about talking with his friends, wrestling with Fraser, and seeking to scuffle with Jasperson, and when he seems to have taken offense at something said or done in Fraser's Saloon, he knew where he had left the gun, went after it, returned, ordered more drinks, and before drinking sought out the individual at whose words or acts he had taken offense, and shot him. There is nothing in this conduct on his part, or noticed by those who saw him, that indicates a diseased mind or inability on his part to distinguish between right and wrong, or that he did not know what he was doing.''

"As we understand Section 1393, B. & C. Comp., drunkenness alone is not insanity, and to constitute it a defense for crime it must result in a diseased condition of the mind as the result of continued drunkenness, such as delirium tremens or other form of insanity. There are many cases holding that mental incapacity, produced by voluntary intoxication, and existing only temporarily at the time of the commission of the criminal act, is no defense to the prosecution therefor. For a full discussion of this subject, see note to Harris v. United States, 32 L. R. A. 465; Upstone v. People, 109 Ill. 169; State v. Hundley, 46 Mo. 414, State v. Thompson, 12 Nev. 140; Fisher v. State, 64 Ind. 435; Gunter v. State, 83 Ala. 96 (3 South. 600); People v. Ferris, 55 Cal. 588; Beck v. State of Georgia, 76 Ga. 452.''

"And in Aszman v. State, 123 Ind. 347 (24 NE 123; 8 L. R. A. 33), it is said that drunkenness is not insanity and does not constitute an unsound mind,

unless the derangement which it has caused has become fixed and continued. See, also, Gunter v. State, 83 Ala. 96 (3 South. 600); Flanigan v. People of State of New York, 86 N. Y. 554 (40 Am. Rep. 556) Harris v. United States, 8 App. D. C. 20 (L. R. A. 465). So that the fact alone, that one is intoxicated, is not a defense for crime, except that it may be taken into consideration in determining the purpose, motive or intent with which the act is done, as specified in Section 1393, B. & C. Comp.; otherwise it is unavailing, unless it results in delirium tremens or other form of insanity." *State v. Trapp* (supra).

■ The "right and wrong test" applies to cases of alleged insanity through alcoholism as fully as to alleged insanity of other types. *State v. Zorn* (supra).

■ In the case of *State v. Hansen* (supra), the court quoted with approval from *State v. Coleman*, 27 La. Ann. 691, as follows:

"Drunkenness is no excuse for a crime, and any state of mind resulting from drunkenness, unless it be a permanent and continuous result, still leaves the person responsible for his acts."

The distinction between voluntary immediate drunkenness on the one hand and derangement from the use of intoxicants which has become fixed and continued is again recognized in *State v. Weaver*, 35 Or. 415, 58 P. 109 (1899).

"The mental effects of a mere voluntary intoxication may not excuse the commission of an unlawful act or relieve from its consequences; but if excessive and long-continued use of intoxicants produces a mental condition of insanity, permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable."

*Cochran v. State*, 65 Fla. 91, 61 So. 187 (1913); See, also, *Strickland v. State*, 137 Ga. 115, 72 SE 822 (1911); and *People v. DeMoss* (supra).

The distinction between voluntary immediate intoxication resulting in a mental derangement which does not relieve of responsibility, and settled insanity of a more or less permanent nature which is a defense is generally recognized. A learned author asserts it to be the rule in the majority of states that neither intoxication nor temporary insanity induced by recent voluntary use of ardent spirits will excuse crime. He continues:

"The rule which refuses to recognize intoxication, or temporary insanity resulting from it, as a defense to crime or tortious acts, does not extend further, for it is well recognized that, where the intoxication has resulted in settled insanity of a more or less permanent nature, it will excuse crime committed under its promptings. It has therefore become important to know just where temporary insanity, as the term is here used, resulting from the recent voluntary use of ardent spirits, ceases, and settled alcoholic insanity, growing out of it, begins. "Some of the earlier decisions seem to hold that, where the intoxication affects the understanding of the inebriate to that extent that he can no longer entertain a criminal motive, it has become legal insanity, and may be pleaded as a defense to crime. But a different rule is now recognized by the courts of Texas and by those of the American states at large. It is recognized: (1) That a species of temporary insanity may be produced by long and continued use of intoxicants, in which state the person's mind is temporarily so affected that it is incapable of knowing the right and wrong of his acts. This condition of the mind is the direct result of the voluntary act of the defendant, in becoming intoxicated, and will not excuse crime, except to reduce the de-

gree of murder and show the lack of a necessary intent, as we have seen supra. (2) The continued use of intoxicants may result in a breaking down of the brain and nerve cells, so as to bring about a derangement of the mind, which continues after the mere temporary effect of the ardent spirits has passed off. This condition is variously known as *delirium tremens, dipsomania, alcoholic dementia,* and *mania a potu.* Control over the derangement has at this point passed beyond the volition of the person affected, and has become an involuntary result of the intemperate act. This is what is sometimes known as *settled* alcoholic insanity, and it is well recognized as a form of legal insanity, in the sense that it will excuse criminal acts committed under its influence.'' Smoot, Law of Insanity, pp 40 and 41.

The foregoing is a mere review of well-established rules. It is, however, appropriate because it demonstrates the limited scope of legal irresponsibility as compared with the breadth of the field explored by the psychiatrist, and thus it suggests very numerous types of irrational conduct which might be of interest to an alienist but which are wholly insufficient to require the submission of insanity as a defense.

It is in the light of these principles that we must determine whether or not specific instances of irrational conduct appearing in the state's case require the submission of insanity as a defense under instructions of the court. The authorities indicate that something more than such specific instances should be required before the insanity defense can be said to have been raised. Depravity of character and abandoned habits would, of course, be admissible upon the issue of insanity where that issue is properly presented. Yet, it is held that depravity of character and abandoned habits are not in themselves evidence of insanity (irresponsibil-

ity). Neither is the commission of an unnatural or atrocious crime necessarily such evidence. *People v. Spencer*, 264 Ill. 124, N. E. 219 (1914); *Hill v. Hill*, 27 N. J. Eq. 214 (1876); *State v. Stark*, 1 Strob. (S. C.) 479 (1847); *In re Guiteau* (D. C.) 10 Fed. 161 (1882); *State v. Coyle*, 86 S. C. 81, 67 S. E. 24, 138 Am. St. Rep. 1022 (1910); *Ashby v. State*, 124 Tenn. 684, 139 S. W. 872 (1911).

In the case of *State v. Grayson*, 126 Or. 560, 270 P. 404 (1928), this court observed from the evidence that the defendant possessed a hasty temper, accused his daughter-in-law of lewd association, based on "such a flimsy foundation as to indicate a deep-seated and malicious hatred", that his conduct was brutal and indefensible, that he used vile language on the day of the crime, that he had threatened to kill three different people; that when making the threats he "seemed to be mad and shaking." Defendant was convicted of murder in the second degree. Defendant assigned as error the failure of the court to charge the jury on the question of insanity. The court by Justice McBRIDE said:

"There was nothing in the testimony to indicate that the defendant was mentally unsound. On the contrary his testimony indicates a normal mind, entirely capable of discriminating between right and wrong and capable of knowing the wrongfulness and unlawfulness of any action he might commit. The case did not call for any instruction on that subject."

In the case of *State v. Murray* (supra), defendant was convicted of murder in the first degree. The defendant had become jealous of his wife, and it preyed upon his mind.

"He indulged in drinking intoxicating beverages, as people often do when vexed and annoyed, and be-

came infuriated and desirous of killing some one, and did not seem to have much choice as to who it should be, provided it was some one who should wait upon his wife."

"He was evidently in a rage incited by jealousy and aggravated by drink."

The trial court did in fact instruct upon insanity as a defense, but this court, by Justice THAYER said:

"Besides, there is nothing in the evidence that would have justified the jury in finding that the appellant was insane."

The reason which compelled the court to express the foregoing opinion is made clear in the further quotation:

"The court will not undertake to decide upon the facts submitted to the jury, but when a refusal to instruct the jury is assigned as error it may properly look into the evidence before it in order to ascertain whether the party complaining has received any injury therefrom, and if it appear from the whole case before the court that the ruling could not have injured the party against whom it was made, it will not reverse the judgment, although the ruling was erroneous."

In the case of *State v. Zorn* (supra), defendant was convicted of murder in the first degree and sentenced to be hanged. In that case the defendant had been drinking for two weeks "much of the time to excess," seemed to be "off his base" and "acted strange." He then shot his wife twice in the back and attempted to commit suicide. Again, the trial court instructed on insanity, but this court said:

"But it is extremely doubtful whether there is anything in the facts of this case at the time the shooting occurred upon which to found an instruction upon the theory that the defendant was suffering from

temporary insanity *as a result of intoxication or delirium tremens.*" (Italics ours.)

In *State v. Trapp* (supra), the defendant was convicted of murder in the second degree. On the day of the crime he had been drinking, and there was evidence tending to show a high degree of intoxication. He attempted to scuffle with the deceased who told him to quit, and "when defendant protested Jasperson in vulgar language again repulsed him and with his open hand pushed him back." The defendant went out, ordered whiskey, but before drinking he returned to Jasperson and said, "Now, you son of a bitch, go through," and shot him. Defendant Trapp claimed he had no recollection of the shooting and that the deceased was one of his best friends. We find in that case far more evidence of intoxication and irrational acts than in the case at bar. The insanity defense was invoked, and the transcript shows that the defendant asked for two instructions on that subject, which the court gave in substance. Yet, this court said:

"In the case before us, there was evidently no evidence tending to show insanity, either permanent or temporary, on the part of the defendant, or other condition than voluntary, immediate drunkenness, and as the verdict was 'guilty of murder in the second degree,' the effect of the intoxication or condition of defendant's mind, as affecting the question of premeditation, is not involved in this appeal. Therefore, the ruling of the trial court and its instructions upon the questions, as to the degree of defendant's intoxication or its effect upon his mind, were not prejudicial."

There is a surprising similarity between the Trapp case and the case at bar. It is true that Trapp was only convicted of murder in the second degree, but we see

no valid distinction in that fact so far as our present problem is concerned. Insanity as defined by the law (legal irresponsibility) is as complete a defense to second degree murder and manslaughter as it is to first degree murder, and it is insanity as a defense which we are now considering. The relevancy of mental condition on the issues of deliberation, premeditation and specific intent will receive later attention. The point is that despite evidence of gross intoxication, lack of memory, absence of motive and the like, this court said of the Trapp case that there was no evidence tending to show insanity.

In *State v. Gruber*, 19 Idaho 692, 115 P. 1 (1911), the evidence disclosed that the defendant beat his victim to death with a club and also showed the vicious traits and propensity of the defendant. It was held that there was no evidence submitted in the case tending to establish insanity. To the same effect see *Swain v. State*, 215 Ind. 259, 18 N. E. (2d) 921 at p. 924 (1939); and *People v. Oxnam*, 170 Cal. 211, 149 P. 165 (1915).

The foregoing principles will now be applied to the evidence in this case. As we have indicated, there is substantial evidence that the defendant was intoxicated at the time of the killing. There is evidence that the defendant did in fact play cards with one Keating. Officer Mitola testified that the defendant, after the killing, stated that he had been in a card game with Keating the day preceding the killing,

"And so he told us he became involved in an argument with Keating, and Keating became quite abusive, and so he left the card room. And the next day he got to thinking about this argument, and also about the incident that occurred several years back, and he got to drinking, and the more he thought about it the madder he got, and the more he drank."

Witness Wong, who met defendant immediately preceding the killing, testified:

"I didn't say much, because I thought he had had a few drinks."

It was a very hot day. Defendant was talking "loud or boisterous". Witness Bredemeyer, who saw defendant at the time of the shooting, testified:

"I got to thinking about this fellow being drunk, and I turned around and looked."

He saw defendant talking to the deceased. Witness Wilson testified that he held defendant immediately after the shooting and that

"He had an odor of liquor. You could tell he had been drinking some. * * * He was under the influence of liquor partially."

The officers who accompanied the defendant to the police station afterwards testified:

"Q Was he intoxicated?
"A I would say so."

Witness Mitola testified that the defendant was flushed and used profane language, that he was more or less irrational.

■ On the other hand, there is in the record no opinion evidence on the issue of insanity, either by layman or expert. There is no evidence of chronic alcoholism or drinking over a long period of time. There is no evidence of hereditary taint. There is in fact not a single irrational act or a single delusion except those which occurred on the day of the killing, the day on which it appears defendant became voluntarily and immediately intoxicated. There is no evidence of a prior injury to the brain or of irrational conduct before or after the day. There is evidence that defendant had

only one hand, though there is none as to how, where or when he lost it, or what, if any, effect it had upon him. Nor does the record disclose any evidence upon the basis of which the jury could be permitted to find that the defendant suffered from mania a potu. If this term, unique in the jurisprudence of Oregon, means merely mental derangement as a result of voluntary and immediate intoxication, then the authorities cited supra demonstrate that mania a potu is not a defense to crime. But if the term means "insanity resulting as a secondary effect produced by excessive and protracted indulgence in intoxicating liquors" in which "the patient becomes a madman fully deprived of reason while the fit is upon him" (32 C. J. p. 616, § 100; *State v. Hurley*, Houst. Cr. (Del) 28, at p. 35) as we think it does, then it would appear clear that mere evidence of voluntary immediate intoxication is no evidence of mania a potu, nor can it be said that such voluntary intoxication is evidence of mental disease nor of dipsomania, which seems to mean a periodical craving for drink which assails some persons with an overwhelming impulse. 32 C. J. 616, Warton & S. Medical Jurisprudence, § 932; *State v. Reidell*, 14 Del. 470, 14 Atl. 550, at p. 551. There is no evidence of any periodical overwhelming craving for or impulse to drink. We grant that dipsomania results in intoxication, but do not agree that intoxication alone is evidence of dipsomania. Truly, it may be produced by intoxication, but before it can be said to raise that issue something more should be shown than the depraved conduct of a drunken capper of a Chinese gambling house.

It is suggested that the defendant was afflicted with coprolalia, which is defined as the "use of obscene or disgusting language,—a symptom of some forms of

insanity.'' (Webster's International Dictionary.) Again, we grant that the use of obscene language may be a symptom of some forms of insanity, but cannot agree that the use of obscenity by a drunken man raises the issue of insanity in the absence of some other evidence of his mental condition. The unfortunate prevalence of bad language among both drunk and sober people would render any other conclusion most alarming.

■ To summarize: The evidence presented by the state and on which the defendant relies was offered not to show insanity but for other purposes. It was confined to specific instances of depraved or abnormal conduct by the defendant on the very day of the crime. All of that conduct would be explainable on either of two theories: the one, insanity, and the other, intoxication. There is no evidence to support the first theory, no previous brain injury, no abnormal conduct by the defendant prior or subsequent to the day, no opinion evidence on the subject, not even evidence of irresistible impulse (which would be insufficient even if proven). Furthermore, there is no evidence whatever of any inability of the defendant to know the nature and quality of his act, or if he did know it, to know that it was wrong. On the other hand, there is ample evidence from which the jury might have found that the defendant was terribly intoxicated, which would explain all his irrational conduct. If it is incumbent upon the defendant to prove insanity as a defense beyond reasonable doubt, and if the evidence is equally explainable on two theories, one insanity and the other intoxication, and there is supporting evidence of intoxication and none of insanity, then the defendant should be required to go further either by proof or at least by specific offer of proof before it could be said

that there was any substantial evidence of insanity (legal irresponsibility).

Again, our statute provides that

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition." O. C. L. A. 26-929.

If evidence which may be explained by intoxication alone is sufficient to open the gates for the insanity defense, then voluntary intoxication in practical effect rises to the dignity of an affirmative defense.

Our conclusion is that the state did not offer evidence sufficient to require the submission of insanity as a defense to the jury. Defendant's motion was based on a misconception of the legal effect of the state's evidence. If the same evidence of irrational conduct had been given with no evidence whatever of intoxication, a closer question would have been presented.

It may next be urged by the defendant that even if the *state's* evidence did not show insanity, nevertheless the *defendant* should have been permitted to present evidence of insanity in his case. At this point the defendant encounters the barrier of our statute, O. C. L. A. 26-846 (supra), concerning notice. Doubt seems to be cast both upon the constitutionality, the construction and the application of that section. It appears valid and if properly construed, controlling. It is urged that defendant's contention is supported by an opinion of Justice Florence Allen, in *Evans v. State*, 123 Ohio St. 131, 138, 174 N. E. 348, wherein she challenged the constitutionality of an Ohio statute which provides:

"A defendant who does not plead guilty, may enter one or more of the other pleas. A defendant who

does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged, provided, that the court may, for good cause shown, allow a change of plea at any time before the commencement of the trial.'' Page's Ohio General Code, sec. 13440-2.

The statement of Justice Allen was pure dictum. The Ohio Supreme Court consisted of seven members. The dictum is stated to be the opinion of ''two of the members of this court, including the writer of this opinion.'' The Evans case was decided on December 17, 1930. On December 10, 1930, the Ohio Supreme Court, Justice Allen concurring and without dissent, decided the case of *State v. Nooks*, 123 Ohio St. 190, 174 N. E. 743. The section of the Ohio code under consideration read as follows:

''Whenever a defendant in a criminal cause shall propose to offer in his defense, testimony to establish an alibi on his behalf, such defendant shall, not less than three days before the trial of such cause, file * * * a notice in writing of his intention to claim such alibi; * * * in the event of the failure of a defendant to file the written notice in this section prescribed, the court may, in its discretion, exclude evidence offered by the defendant for the purpose of proving such alibi.'' 10 Page's General Code, § 13444-20.

The defendant had failed to give the notice required by the statute but made specific offer for the purpose of proving an alibi. The offer was rejected. On appeal the Ohio Supreme Court said:

''Upon a consideration of the entire record we see no abuse of the discretion given the trial judge in the section noted by excluding this testimony * * *.''
''To hold that there was an abuse of discretion

under this record is to deprive section 1344-20 of any force and effect, as it is difficult to conceive how any alibi testimony in a criminal case would not tend to disprove the testimony offered by the state upon the point of the whereabouts of the accused at the time and place of the commission of the offense.

"Not being willing to disregard the statute in question * * *."

The conviction was affirmed.

The Ohio statute on alibi in form closely resembles the Oregon statute on insanity. It appears probable that the Ohio statute on the insanity plea will be held constitutional by the courts of that state. See 6 Cincinnati Law Rev. 1932, p. 313.

■ The law is well established that where a defendant is afforded the opportunity by statute to raise the question of his irresponsibility by reason of insanity at the time the act was committed but chooses not to do so and interposes only a general plea of not guilty, he cannot under such plea claim irresponsibility by reason of insanity and demand an acquittal by reason thereof. This much is conceded in *Ingles v. People*, 92 Colo. 518, 22 P. (2d) 1109, to which reference will be later made.

The following states have enacted laws which provide that one who intends to rely on the insanity defense shall, at a time usually specified, give notice thereof. In some instances a formal plea is required; in others only a notice in the nature of a specification under the plea of not guilty. Alabama: 2 Code Ala. (Criminal) 1896, Sec. 4939, Code Ala., 1928, Sec. 4873; California: Deering's Penal Code of Cal., 1931, Sec. 1016, 1026; Colorado: Colo. Stats. Anno., 1935, Sec. 507; Louisiana: Code of Criminal Procedure, 1929, Art.

267, Dart's Code of Criminal Procedure, 1932, Art. 261 and 267; New Hampshire: Public Laws, 1926, Chap. 369, Sec. 2; New York: 66 McKinney's Consol. L. p. 536, sec. 336; Code, 1933, Sec. 336; Ohio: Page's General Code, sec. 13440-2; Wisconsin: Statutes, 1939, Sec. 357.11.

Under these statutes it is well established that a defendant who fails to give notice or enter a special plea at the time required has no absolute right to avail himself of the insanity defense, although in some states the court may, in its discretion for good cause shown, permit him to do so.

An Indiana statute provided:

"When the defendant desires to plead that he was of unsound mind when the offense was committed, he, himself, or his counsel must set up such defense specially in writing; and the Prosecuting Attorney may reply thereto by a general denial in writing." Indiana Revised Statutes, 1881, Sec. 1764.

In *Walker v. State* the defendant was indicted for assault with intent to commit murder. Defendant was convicted. Upon appeal the court said:

"We are of the opinion that the court did not err in refusing to permit the appellant to introduce evidence tending to prove that he was of unsound mind. No issue of that kind was involved in the case. Section 1764, Rev. St. 1881, requires insanity to be specially pleaded. In the absence of such a plea, the state is not expected to be prepared to meet such an issue. If the appellant desired to avail himself of such a defense, he should have pleaded it specially, which he did not do." *Walker v. State*, 136 Ind. 663, 36 N. E. 356 (1894).

The Indiana statute does not specify the time at which written notice is to be given, but the validity of

the statute is affirmatively recognized in *Swain v. State*, 215 Ind. 259, 18 N. E. (2d) 921 at 922.

The Alabama statute provides:

"When the defense of insanity is set up in any criminal prosecution it must be by special plea, interposed at the time of arraignment and entered of record upon the docket of the court, which in substance shall be, 'not guilty by reason of insanity.' Such plea shall not preclude the usual plea of the general issue, which shall not, however, put in issue the question of the irresponsibility of the accused by reason of his alleged insanity, this question being triable only under the special plea." Criminal Code of Ala., 1896, § 4939.

In *Morrell v. State* defendant was convicted of murder in the first degree. Upon arraignment she plead not guilty. When the cause was called for trial on the day set therefor, the defendant, through her attorney, asked leave of the court to withdraw the plea of not guilty and put in a plea of not guilty by reason of insanity. Objection was made by the state on the ground that the plea came too late. Objection was sustained by the trial court, and exception was duly taken. The court cited the statute and said:

"Defendant's absolute right to defend on the ground of insanity was lost by her failure to plead to that end when she was arraigned, and her right to thereafter interpose that defense was subject to the trial court's discretion. If it be conceded that the court's action in that regard can be properly reviewed, the revision cannot extend beyond the ascertainment of whether there was an abuse of discretion; and that there was such abuse in the present case does not appear." *Morrell v. State*, 136 Ala. 44, 34 So. 208 (1903).

In *State v. Toon* the defendant was indicted for murder. A Louisiana statute provided for the entry of a plea of insanity (Sec. 261) and further provided:

> "Whenever insanity shall be relied upon either as a defense or as a reason for defendant's not being presently tried, such insanity shall be set up as a separate and special plea and shall be filed, tried and disposed of prior to any trial of the plea of not guilty, and no evidence of insanity shall be admissible upon the trial of the plea of not guilty."
> Code of Criminal Procedure (Dart, 1932) Art. 267.

The defendant objected to arraignment under the provisions of the code on the ground that those provisions relative to arraignment and trial and pleas of insanity were unconstitutional. The objection was overruled. Defendant then stood mute, whereupon the court, as provided by law, entered a plea of not guilty for him. Defendant refused to plead insanity when the case came to trial, but under the plea of not guilty he called physicians to testify as to insanity at the time of the commission of the offense. The offer of proof was refused by the court. Thus the issue concerning the constitutionality of the statute was directly before the Supreme Court on appeal. That court said:

> "The objection that the defendant has to article 261 of the Code of Criminal Procedure seems to be that prior to its adoption, the sanity of the accused was an issue in the case, of which the accused could avail himself by the introduction of evidence to show his insanity, under the plea of not guilty, whereas, under this article of the Code, the sanity of the accused is not put at issue by the plea of not guilty, but requires a plea of insanity to put it at issue.
> "The effect of the article is merely to make a change in procedure by which the question of in-

sanity is withdrawn from the plea of not guilty, and required to be raised by a distinct plea.

"There is nothing which, by this change, deprives an accused of a single constitutional right, or which makes the article unconstitutional. The article does not deprive defendant, in any manner whatever, of the right to a speedy public trial by an impartial jury." *State v. Toon*, 172 La. 631, 135 So. 7 (1931).

In the Washington case of *State v. McLain*, 199 Wash. 664, 92 P. (2d) 875, the defendant, who did not give the required notice, offered to call a physician to testify as to the insanity of the defendant. The offer was rejected, and the Supreme Court affirmed. The statute, although not identical with our own, yet closely resembles it, and the validity of the Washington statute is recognized by the decision of the court which enforced its terms. See also *People v. Morgan*, 9 Cal. App. (2d) 612, 50 P. (2d) 1061.

The California statute, Penal Code, 1931, Sec. 1016, provides for various pleas, among them "Not guilty by reason of insanity." The same section further provides:

"A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged, provided that the court may for good cause shown, allow a change of plea at any time before the commencement of the trial."

In *People v. LaCrosse*, 5 Cal. App. (2d) 696, 43 P. (2d) 596 (1935), the defendant being charged with robbery refused to plead upon arraignment, whereupon trial court directed the clerk to enter a plea of not guilty. At the inception of the trial, but after the defendant had answered "ready", the defendant moved

for leave to add to his plea of not guilty a special plea of not guilty by reason of insanity. The trial court refused to permit defendant to add the special plea. The propriety of this ruling being raised upon appeal, the court said:

"The point is without merit. It was determined adversely to the contentions here made in People v. Hall, 220 Cal. 166, 30 P. (2nd) 23, and an appeal in that case to the Supreme Court of the United States was dismissed, 292 U. S. 614, 54 S. Ct. 869, 78 L. Ed. 1473."

The court said further:

"The defendant had ample opportunity to enter the special plea if he had desired and no statute or rule of law denied that right if exercised within a reasonable time. The defendant was arrested on July 27, 1934. He was arraigned and his trial was set for September 24th by consent. The trial commenced on October 18th, at which time he asked leave to change his plea. He was represented by counsel when arraigned and at all subsequent proceedings. Thus there has been no denial of the constitutional guaranty of due process, but merely a failure to use the due process provided for his benefit. In support of the point, the appellant argues that section 1016 of the Penal Code is unconstitutional in that it declares that one who fails to make the plea 'shall be conclusively presumed to have been sane at the time of the commission of the offense charged.' The same question was decided adversely in People v. Troche, 206 Cal. 35, 48, 273 P. 767."

In *People v. Nolan*, 126 Cal. App., 623, 14 P. (2d) 880, the defendant was convicted of murder and upon appeal predicated error,

" * * * Upon an order made by the trial court, after the trial of defendant had commenced and

had been in progress for several days, by which was denied the motion made by defendant that he be permitted to add a plea of 'not guilty by reason of insanity' to the former plea interposed by him of 'Not guilty'."

The cause had been pending for some months and had once been delayed at defendant's request. Three days before the date set for the trial defendant's attorney orally requested permission to enter the additional plea of "not guilty by reason of insanity." The motion was renewed at the commencement of the trial, but there was no showing of good cause in connection with either motion. A third motion was filed during the progress of the trial, which was supported by affidavits which were answered by counter-affidavits on behalf of the state. The court said:

"In the instant case, since no attempt was made by defendant on either the first or the second presentation of the motion to show 'good cause,' it is plain that no error was committed by the trial court in its order by which the requested leave was denied. As to the third of such applications, aside from the sufficient reason for its denial found in the clear indication contained in the language of the statute, that, even assuming that 'good cause' may appear, the motion must be made 'before the commencement of the trial' (which was not done in the instant case), the ruling in People v. Northcott, 209 Cal. 639, 654, 289 P. 634, 70 A. L. R. 806, to which attention hereinbefore has been directed, is to the effect that the determination of such an application rests within the discretion of the trial court. Since the record herein discloses the situation that the facts which appeared by the several affidavits of the respective parties afforded ample justification for the conclusion reached by the trial court on determination of the motion, it follows

that the said court did not abuse its discretion in making the order of which complaint is made.''

And to the same effect, see *People v. Nolan* (supra), and *People v. Northcott*, 209 Cal. 639, 289 P. 634, 70 A. L. R. 806.

Two well-considered cases, both from the Supreme Court of California, expressly uphold the constitutionality of the California statute as being a regulation of procedure only which does not deprive the defendant of any constitutional right. *People v. Troche*, 206 Cal. 35, 48, 273 P. 767; *People v. Leong Fook*, 206 Cal. 64, 273 P. 779, and see *People v. La Crosse*, 5 Cal. App. (2d) 696, 43 P. (2d) 596.

■ The foregoing authorities establish that the Oregon statute, insofar as it requires notice of purpose to present the insanity defense, is valid. Counsel for the defendant recognized and the authorities also demonstrate that the statute was applicable to the case at bar and that the only question is whether the trial court abused its discretion. No such abuse appears from the record. No question was ever asked concerning the defendant's ability to distinguish between right and wrong or concerning his previous or subsequent mental condition. No expert was called. No offer of proof of any facts relevant to the insanity issue was made, nor is complaint here made of the exclusion of any specific evidence on that issue. The ensuing review of the record discloses that defendant's contentions were based on the evidence adduced by the state, and it fails to disclose that the defendant had any new evidence of alleged insanity to offer. In the

course of the trial, defense counsel made the following statements:

> "In view of the statements by Mr. Bain in his opening statement, the actions can only be explained on the basis of an insane man, and we feel it necessary to put in that defense."

> "Mr. Elliott: The insanity proposition arises with Mr. Lomax and I solely upon Mr. Bain's statement of what Ralph Scheurer is to testify to * * *."

> "Mr. Lomax: * * * In view of the testimony of Mr. Scheurer, the defendant wishes to renew his motion to allow him to include *as a defense,* and in excuse to any act he is accused of by the indictment in this cause, the ground of temporary insanity * * *." (Italics ours).

> "Mr. Lomax: The defense has made a motion to allow the defendant to include in his plea of Not Guilty the plea of Not Guilty by reason of insanity *based solely on the State's case.*" (Italics ours).

> "Mr. Lomax: (speaking of the statute) * * * It means when facts develop in the trial of the case of which defense counsel has no way of knowing, no way of ascertaining, then it is an abuse of the Court's discretion to say you can't interpose a plea of insanity where a plea of insanity should be put forth by the defendant to excuse him for his acts."

> "* * * The defense hasn't put one witness on the stand yet—the State's own witnesses have proved the case of insanity beyond a question of reasonable doubt."

Defendant's contentions are based solely on the state's evidence, and his case must stand or fall upon the proper construction of that evidence, which, as we have seen, is insufficient to require the submission of the insanity issue. The only surprise claimed by counsel for the defendant was that they did not know of

the specific language employed by the defendant before the killing.

In this connection an opinion of the Washington Court is suggestive. The Washington statute provided that:

> "When it is desired to interpose the defense of insanity or mental irresponsibility, * * * the defendant * * * shall, at the time of pleading to the information or indictment, file a plea * * * setting up his insanity or mental irresponsibility, * * *."

and further provides that

> "The plea may be interposed at any time thereafter before the submission of the case to the jury, if it be proven that the insanity or mental irresponsibility of the defendant at the time of the crime was not before known to any person authorized to interpose a plea." Rem. Stat. § 2174.

On the third day of the trial defendant served a special plea of insanity. The attorney stated that he had conceived the idea as a result of testimony previously given by police officers concerning admissions and contradictory statements made by the defendant. The trial court rejected the plea, and upon appeal the Supreme Court said:

> "The proof in support of the plea was insufficient because it was not shown that appellant's attorney did not *know* of his client's insanity. The evidence was merely that the appellant had not told his attorney of certain contradictory statements previously made by him to the investigating officers. Lack of information by the attorney concerning appellant's prior admissions did not establish his lack of knowledge of the primary fact of insanity." *State v. McLain* (supra).

■ By a similar process of reasoning, we hold that the defendant has not sufficiently shown just cause for failure to file the notice required by statute when he merely shows by counsel's unsworn statement that counsel did not know of certain specific language used by the defendant and disclosed by the state. If we assume, contrary to fact, that the defendant had testimony of insanity to offer and offered it, still the defendant has not shown any just cause for failure to give the notice required by statute. The only matter which could be or was claimed as just cause for such failure is the alleged fact that the defendant's counsel did not know what specific language was used by the defendant on the day of the shooting and while he was intoxicated. If that language and conduct was insufficient to raise the issue of insanity, then ignorance of it was insufficient to establish just cause for failure to give the required notice.

It is earnestly and persuasively urged that evidence of insanity or mental defect, if not admissible as a defense under the statute, should in any event be received as bearing on the issue of premeditation and deliberation and for the enlightenment of the jury in determining the penalty—whether death or life imprisonment. This position presupposes that there was such evidence of insanity and that its existence was made known to the court, a matter which has already been discussed. Furthermore, there was no specific offer of testimony of insanity for the purpose of reducing the offense to second degree murder or mitigating punishment, or for any other purpose. The record as quoted also makes it clear that defendant was not asking to present alleged insanity to reduce the degree or mitigate the punishment. They repeatedly stated their

claim that the insanity issue should be submitted *as a defense.*

But there is a more fundamental objection to the suggested construction. In support of defendant's position reference has been made to the Colorado case of *Ingles v. People* (supra). The court in that case stated that insanity as a defense was not admissible under the Colorado statute, but it said further:

"But is he entitled to introduce evidence of insanity or mental derangement short of insanity for the purpose, not of acquittal, but of reducing the grade of the crime from murder of the first degree to murder of the second degree? Some courts hold that he cannot do so. People v. Troche, supra. We believe that the weight of authority and the better reason are to the contrary."

The force of the Colorado decision is lost when the statute upon which the decision was based is compared with that of Oregon. The Colorado statute provides in part:

"If one of the *defenses* of the defendant be insanity, said defense must be pleaded orally * * * as a specification to the plea of not guilty * * *." 2 Colo. Statutes Ann., 1935, Sec. 507, p. 1150. (Italics ours.)

■ The Colorado statute and those of most of the states requiring a special plea of insanity are clearly limited in their purview to a situation in which insanity is to be urged as a *defense.* The Oregon statute is not so limited. It clearly applies to cases in which the defendant purposes to show insanity as a defense (with us an affirmative defense). But it also applies when insanity is to be employed not as a defense but to reduce the degree or mitigate the punishment. By its terms, no-

tice is required where the defendant "purposes to show in evidence that he was insane or mentally defective at the time of the act." There is nothing in the Oregon statute which limits its application to cases in which insanity is to be employed for the more important purpose of acquittal but which excludes from its application cases in which insanity is to be employed for the lesser purpose of mitigation. In this aspect the Oregon statute resembles the Ohio statute requiring notice of intention to prove an alibi. It is a requirement of reasonable notice of intention to prove defensive matter. The decision sustaining the alibi statute is persuasive here.

■ In Colorado, unlike Oregon, the state has the burden of proving sanity beyond a reasonable doubt. *Jones v. People*, 23 Colo. 276, 47 P. 275 (1896); *Pribble v. People*, 49 Colo. 210, 112 P. 220 (1910); *Ingles v. People* (supra). Its courts uphold the validity of a statute which requires notice of intention to produce evidence of insanity as a complete defense, though that evidence is to be employed only negatively on an issue which the state must prove. *Ingles v. People*, (supra). If that statute is valid, a fortiori, the Oregon statute is likewise valid when construed as requiring notice of intent to produce evidence of insanity for the defensive purpose of reduction of degree or mitigation of punishment.

The Oregon statute is modeled upon Section 235 of the Code of Criminal Procedure adopted by the American Law Institute, although the stringent requirements of the Model Code are somewhat relaxed in the Oregon statute. The Model Code, Section 235, is as follows:

"Where the defendant pleads not guilty and purposes to show in evidence that he was insane or

mentally defective at the time of the alleged commission of the offense charged, he shall at the time he pleads, or at any time thereafter, not later than four days before trial, file a written notice of his purpose. If the defendant fails to file such notice he shall not be entitled to introduce evidence tending to establish such insanity or mental defect. The court may, however, permit such evidence to be introduced where good cause for the failure to file the notice has been made to appear.''

Neither the Model Code nor the Oregon statute makes any reference to insanity as a defense, but both are directed to the *exclusion of evidence* of insanity unless notice is given or good cause shown. The Model Code provides that upon failure to file such notice defendant ''shall not be entitled to *introduce evidence* tending to establish such insanity or mental defect.'' (Italics ours.) The Oregon statute provides that he shall not be entitled to *introduce evidence* for the establishment of such insanity or mental defect. Again, our statute employs the phrase ''insanity or mental defect,'' the apparent purpose of which was to make sure that the statute should require the giving of notice where mental disease is to be shown, even though that disease or mental defect is not of such a character as to constitute ''insanity'' as defined by the law. There is no more procedural hardship in requiring notice, when insanity is to be shown to negative premeditation or to mitigate punishment than there is when it is offered as a defense.

The leading case in support of this position is from the Supreme Court of California, *People v. Troche,* (supra). In that case, after a full discussion of the constitutionality of the California statute, the court considered the identical proposition which is advanced

in behalf of the defendant in the case at bar. The defense in the Troche case contended:

"Second, that, when properly construed, the statute eliminates from the consideration of the jury during the trial of the general issue the question of the 'legal insanity' of the defendant—the only kind of insanity which excuses one from punishment for a crime committed—but does not prevent the introduction of the evidence tending to establish the mental condition of the accused at the time the offense was committed, for the purpose of showing a lack of criminal intent, malice, or premeditation, such evidence to be also considered by the jury, in the exercise of its discretion in a trial for murder, in fixing the degree of the crime and the punishment at life imprisonment or the extreme penalty, if it finds the offense to have been murder in the first degree."

This contention was rejected. The court said:

"The trial court committed no error in strictly following the letter of the statute (Pen. Code, §§ 1020 and 1026) and excluding on the trial of the general issue of not guilty, all evidence tending to show the mental condition of the defendant at the time of the commission of the offense." * * *

"It follows, therefore, that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the immediate circumstances of the offense, would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. As the statute accorded the defendant his full right, and ample opportunity to submit to a jury his plea of insanity at the time of the commission of the offense, in excuse of his act and as a reason why no penalty of the law should be visited upon him, it follows that the trial court

correctly excluded the evidence on the trial of the general issue.''

The wisdom of the provisions of the Model Code, prepared by a group of profound specialists in criminal law is apparent. If notice should be required only when insanity is presented as a defense, a defendant having conclusive evidence of insanity could present his entire case, embellished with the testimony of alienists applying the right and wrong test, without giving any notice, by merely asserting that it was offered to disprove deliberation or the like. With such evidence in the record it would be a bold judge indeed who would refuse to submit also the issue of insanity as a defense. Such a construction of our statute would nullify all the benefits for which it was passed.

■ For the reasons stated, our conclusion is that the Oregon statute is valid, that the defendant has failed to comply with it, that no just cause for failure has been made to appear and that there was no abuse of discretion in the denial of the defendant's motion for leave to file the required notice.

■ This conclusion is not based alone on the above considerations. The record shows that the court in the exercise of its discretion gave careful consideration to the equities of the situation. At the request of the defendant and at expense of the state an eminent psychiatrist had been employed who before trial had examined the defendant and had reported that he was sane, which report was in the hands of defendant's attorneys. When, at the trial, the defendant moved for leave to introduce the insanity defense, the report was produced, and the court examined it. The court was justified in concluding that the defendant's counsel had fully explored the matter of defendant's mental

condition and had deliberately omitted to raise the issue. The court was also impressed by the fact that defendant's delay in raising the issue had lulled the prosecution into a sense of security, with the result that it had not examined the jurors concerning their attitude on the insanity defense, which was a clear right of both parties if insanity was to be in issue. The statute is in complete harmony with the modern doctrine in the entire procedural field, which is to require frank disclosure of issues and evidence and to avoid surprise and chicanery. If, in the absence of notice or just cause for failure to give notice, the court permits the issue of insanity to be raised, the statute itself becomes a trap for the prosecution instead of an aid in the administration of justice.

The crime was committed on August 8, 1941, on which date the defendant was arrested. He was indicted on September 12, 1941, and arraigned on September 17th. Upon arraignment the cause was continued for motion or plea. On September 30th, the defendant's attorneys moved for the appointment of an expert to examine the sanity of the defendant. On October 2, the court made an order authorizing defendant's attorneys to employ at the cost of the state a qualified physician "to determine the sanity or insanity of the defendant at the time of the commission of the alleged crime." On October 21, the defendant plead not guilty. The cause came to trial on November 18, 1941. Defendant's counsel were afforded ample facilities and time within which to investigate the mental condition of the defendant, both before and after the entry of his plea. There was no abuse of discretion by the court in ruling upon the belated motions of the defendant in the midst of the trial.

■■ The court clearly instructed the jury upon all phases of the case. On the issue of intoxication, it instructed in part as follows:

"Although intoxication does not justify or excuse the commission of a crime, it is a fact or circumstance to be considered in determining the question of premeditation and deliberation * * *."

"I further instruct you that no act committed by a person while in a state of voluntary intoxication shall be less criminal by reason of his condition, but the fact may be considered in determining the purpose, motive, or intention with which he committed the act.

"I further instruct you in this connection that voluntary intoxication, to be available as a defense, must result in a diseased condition of the mind, delirium tremens, or some other form of insanity, and, therefore, in such a case, the burden is upon the defendant to prove such fact beyond a reasonable doubt as in other cases of insanity."

It has been suggested, though not by the defendant, that, by instructing as it did, the court must have had the opinion that the issue of the defendant's mental condition was one properly to be considered. It is true that the mental condition, so far as it was affected by voluntary intoxication was properly to be considered, and it was properly submitted to the jury. The reference in the court's instructions to intoxication which results in "delirium tremens or other form of insanity" as to which "the burden is upon the defendant to prove beyond reasonable doubt", was obviously made as a proper limitation upon the instruction concerning intoxication and not for the purpose of submitting insanity as a defense to the jury. In any event, no exception was taken to that instruction. The complaint

of the defendant is not that such instruction was given, but it is rather that additional instructions presenting the insanity defense were not given.

■ The inference has been drawn that the defendant was a poor man because of the fact that the court appointed two attorneys to defend him. In the proposition that rich and poor should enjoy equal protection of the law, we heartily concur, but defendant's financial condition should be and is wholly immaterial if he received a fair trial, as we find that he did. We are conscious of the sacredness of human life and the gravity of this case, but this court is not authorized to determine the penalty which should be imposed for this atrocious crime. Since life is at stake, we must proceed with extreme caution for the protection of all rights of the accused, but we are authorized only to determine if error was committed at the trial and if the fundamental principles which underlie all judicial procedure were respected.

Finding no error and no want of due process, the conviction is affirmed.

KELLY, C. J. (dissenting). On the 8th day of August, 1941, defendant fatally shot Benjamin H. Finkell. Defendant was indicted for murder in the first degree. Defendant entered a plea of not guilty, but did not file a written notice of his purpose to show in evidence that he was insane or mentally defective at the time of the alleged commission of the act charged.

At the conclusion of the opening statement by the District Attorney, counsel for defendant interposed the following motion:

"Mr. Elliott: If the court please, there has been no surprise to the defense at all as to the statement

made by the District Attorney, except in one or two particulars, and in view of the statement made by Mr. Bain, and the intention of the State to prove the things they intend to prove, counsel and myself feel that it is necessary to ask the Court, as provided by the Code, to introduce the plea of insanity for the defendant. The District Attorney may now object because of the failure to serve the District Attorney with notice at the time of pleading to the indictment. From the statements made by the District Attorney some of the statements made by the District Attorney, can be explained only by the defendant through evidence offered as insanity. We ask the Court to exercise its discretion at this time and permit us to introduce testimony of that nature."

The District Attorney opposed the motion, and the court and counsel retired to the court's chambers.

During the discussion in chambers, counsel for defendant made the following statement in answer to the question by the court:

"Did you have something to say Mr. Elliott before I conclude?"

"Mr. Elliott: Yes, The only opportunity we wish in the trial is not to be curbed in any way on the introduction of evidence that we have now to controvert evidence that the District Attorney has to offer. Some of the evidence that the District Attorney apparently anticipates can be controverted only by testimony that we intend to introduce through our witnesses and on cross-examination of the State's witnesses to the effect that this defendant a short time prior to the incident, and a short time subsequent to the incident must have been insane—to prove his insanity. We can't explain these actions any other way. A sane man can't perform those actions, if the District Attorney is able to prove them."

The court denied the defendant's motion.

At the conclusion of the state's case in chief, counsel for defendant addressed the court thus:

"Mr. Lomax: I am renewing the motion to allow us to include as a defense for the defendant the plea of Not Guilty by reason of the temporary insanity of the defendant."

The writer thinks that a fair construction of the record discloses that defendant was prevented from presenting the defense of temporary insanity by the ruling of the trial judge.

Among other things, in this opening statement as to the course taken by defendant on the day of the shooting, the District Attorney said:

"Wallace, the defendant, went into the Olympian, and he met Mr. Scheurer—Mr. Scheurer the pan dealer, and he says, 'I am going to get me some white meat, I don' care a damn who it is, but I am going to get some.' And then Scheurer says, 'They are all my friends.' And Wallace said, I mean your friend Buster Keating.' And he pressed the gun so hard against Scheurer that it left an impression on his body where he pressed the gun against him."

In chambers, in speaking of a report of a psychiatrist upon the mental condition of defendant, the following colloquy took place:

"The Court: I wanted to ask you gentlemen whether there was an application made and an order made toward permitting the defendant to employ a psychiatrist to examine the sanity of the defendant.

Mr. Lomax: That was done, your Honor. Dr. D. C. Burkes examined the defendant and gave a report, the original of which was given to Mr. Potts, pronouncing him sane.

Mr. Elliott: There was some qualification it [in] it, but it was not substantial enough upon which to predicate a defense, but in view of the statements by Mr. Bain in his opening statement, the actions can only be explained on the basis of an insane man, and we feel it necessary to put in that defense.

Mr. Lomax: This is the first I heard of him saying he was going to shoot all his friends.

Mr. Bain: That is what he said, 'I am going to shoot all my friends.'

Mr. Lomax: And, 'I am going to get some white meat' that is the first time I ever heard that.''

Thus it will be seen that as cause for failure to file the notice of a purpose to interpose the defense of insanity, defendant's counsel stated that until the District Attorney's opening statement, they were not apprised of the proof that defendant had made the allegedly irrational threats related by the District Attorney.

A careful examination of the record convinces the writer that this is a case where the question of the mental condition of defendant should have been presented to the jury without any restriction or restraint aside from the application of the approved rules of evidence governing such issue.

As the writer construes the cases cited by the District Attorney, they are not inconsistent with this conclusion.

In *People v. Hickman*, 204 Cal. 470, 268 P. 909, 270 P. 1117, it was held that when the only plea entered was ''not guilty by reason of insanity'', and the only issue submitted to the jury was whether defendant was sane or insane at the time the offenses were committed, the defendant was not entitled to be tried upon the other issues which would have been involved if a plea of not

guilty had also been interposed. The statute of California had this provision.

"A defendant who pleads not guilty by reason of insanity, without also pleading not guilty, thereby admits the commission of the offense charged." Ibid, p. 911.

There was no showing that defendant had not committed the acts charged. In the instant case the writer thinks, and he believes, that the trial court thought that the state had introduced testimony tending to show defendant's mental impairment. If the trial court had not so construed the record, he would not have instructed the jury as he did upon that phase of the case.

In *Ingles v. People,* 92 Colo. 518, 22 P. 2d 1109, the defendant interposed a plea of not guilty. The charge in that case was murder in the first degree. The court say:

"Where a defendant is afforded the opportunity, as he is under the act of 1927, to raise the question of his irresponsibility by reason of insanity at the time the act was committed, chooses not to do so, but interposes only the general plea of not guilty, he cannot, under such plea, claim irresponsibility by reason of insanity, and demand an acquittal by reason thereof. But is he entitled to introduce evidence of insanity, or mental derangement short of insanity, for the purpose, not of an acquittal, but of reducing the grade of the crime from murder of the first degree to murder of the second degree? Some courts hold that he cannot do so. People v. Troche, supra. We believe that the weight of authority and the better reason are to the contrary."

One reason assigned by the Colorado court for holding that error had been committed in denying

defendant the right to introduce evidence of insanity was expressed by Mr. Justice Gray in *Hopt v. People*, 104 U. S. 631, 26 L. Ed. 873, and quoted by Mr. Justice Butler, who rendered the opinion in the Ingles case, as follows:

"But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury."

We quote further from the Ingles case:

"There is another reason why evidence of the defendant's mental condition at the time of the homicide was admissible. When a defendant is found guilty of murder of the first degree, the jury 'shall fix the penalty at death or imprisonment for life.' C. L. § 6665. In determining whether the penalty shall be death or life imprisonment, the jury acts in the exercise of a sound discretion. It is conceivable that the mental condition of a defendant at the time of the homicide may be such as to induce a jury, in the exercise of their discretion, to fix the lesser penalty. In California, where a defendant is not permitted, at the trial of the issue raised by the general plea of not guilty, to introduce evidence of mental derangement for the purpose of lessening the grade of the crime, it is held that such evidence may be introduced to enable the jury to determine, the exercise of its discretion, whether to fix the penalty at death or at imprisonment for life. People v. Selph, supra. And see People v. Malone, supra, and People v. Dias, 210 Cal. 495, 292 P. 459."

Another reason for holding evidence of insanity admissible in the Ingles case was that confessions of

defendant were introduced in evidence, and when a confession is introduced the defendant has the right to introduce evidence of all the circumstances surrounding the making of the confession in order that they might be taken into consideration by the jury in weighing the evidence. His mental condition is a material circumstance.

In *Pippin v. State*, 23 Ala. App. 232, 123 So. 298, the defendant killed a man who had outraged defendant's daughter. The details of the outrage were admitted under the plea of not guilty by reason of insanity. The court say: "* * * and theoretically should not have been considered on the issue raised by the plea of not guilty."

The plea of not guilty by reason of insanity is unknown to Oregon procedure. In the Pippin case, the question is not presented whether the defendant should be permitted to introduce evidence of insanity.

*State v. Toon*, 172 La. 631, 135 So. 7, is one wherein—

"Defendant was indicted for murder. Prior to arraignment he filed a plea, objecting to being arraigned under the provisions of the Code of Criminal Procedure, but insisted upon being arraigned under the law, as it was, prior to the adoption of that Code, on the ground that the provisions of the Code relative to arraignment and to the trial of pleas of insanity are unconstitutional. This plea was overruled. Defendant was then arraigned, but stood mute, whereupon the court, as provided by law, entered a plea of not guilty for him. Under this plea, evidence of insanity could not be offered. When the case was called for trial, the court gave defendant an opportunity to plead insanity, but, through his counsel, he refused to avail himself of it, preferring to rest the insanity phase of his case upon the validity of his plea of the unconstitution-

ality of the provisions of the Code of Criminal Procedure, relative to the urging and trial of pleas of insanity. Upon the trial of the plea of not guilty, defendant was convicted of manslaughter.''

It is manifest that it widely differs from the case at bar.

*State v. McLain,* 199 Wash. 664, 92 P. 2d 875, is governed by the provisions of the Washington statute, the first part of which provides that when it is desired to interpose the defense of insanity or mental irresponsibility, the defendant, his counsel, or other person, authorized by law to appear and act for him, shall at the time of pleading to the information or indictment file a plea in writing in addition to the plea or pleas required or permitted by other laws than this setting up (1) his insanity or mental irresponsibility, etc.

The second part of the Washington statute provides:

''The plea may be interposed at any time thereafter, before the submission of the cause to the jury, if it be proven that the insanity or mental irresponsibility of the defendant at the time of the crime was not before known to any person authorized to interpose a plea.''

The Washington court held that the appellant did not meet the requirements of the statute. Oregon has no statutory provision like the second part of the Washington statute.

In *Swain v. State,* 215 Ind. 259, 18 N. E. 2d 921, defendant, Swain, having been convicted of murder in the first degree and sentenced to death, filed a petition for writ of error *coram nobis.* From a judgment of the circuit court denying the petition, he appealed to the supreme court. The evidence relating to defend-

ant's alleged insanity is quoted and discussed in the opinion of the supreme court speaking through Judge Shake. The evidence was held to be insufficient to warrant a reversal of the judgment of the circuit court. The case does not involve the question of the effect of denying defendant the right to present his evidence.

In *People v. LaCrosse*, 5 Cal. App. 2d 696, 43 P. 2d 596, the state introduced no testimony tending to prove mental impairment or irresponsibility. Only the question of the constitutionality of the California statute was presented by defendant.

In *People v. Young*, 26 Cal. App. 2d 700, 80 P. 2d 138, defendant was convicted for a sex perversion. The appellate court held that—

> "Since over four months had elapsed from the time of the original arraignment until the date of the trial, with several intervening court appearances by defendant, and no application for permission to file an additional plea of not guilty by reason of insanity having been made, it is obvious that the trial court in denying the motion here questioned exercised a sound discretion."

There is nothing to indicate that in the Young case any evidence was introduced by the state tending to prove mental derangement on defendant's part. The crime charged therein is not one embracing different degrees dependent upon the mental state of defendant; and the duty did not devolve upon the jury to determine whether defendant's life should be forfeited.

*People v. Nolan*, 126 Cal. App. 623, 14 P. 2d 880, holds that upon defendant's affidavits and the people's counter affidavits, the trial court did not abuse its discretion in denying defendant's application to enter a plea of not guilty by reason of insanity. In the opinion, the contents of these affidavits are not set out.

In *People v. Nye*, 96 Cal. App. 186, 273 P. 837, defendant's motion to interpose a plea of not guilty by reason of insanity was supported only by affidavits based on hearsay.

In *Morrell v. State*, 136 Ala. 44, 34 So. 208, it is held that the record does not disclose an abuse of discretion by the trial court in denying a motion similar to those made in the above cited cases. Other than that defendant killed her husband while he was asleep after he had upbraided her and threatened to kill her, because she was administering medicine to her sick baby instead of preparing an evening meal for her husband. There is nothing to indicate what ground was assigned in support of defendant's motion.

As the writer views it, the case of *State v. Grayson*, 126 Or. 560, 270 P. 404, is not in point upon the question here determined. It declares that well-known rule governing testimony upon insanity by a lay witness and while it is argued that defendant herein should have made a showing that he would introduce witnesses, who if they were of the laity, would testify to an intimate acquaintanceship with defendant and that in their opinion he was insane giving the reasons for that opinion, the writer thinks that in the case at bar no such duty devolved upon defendant.

In the case of *State v. Riley*, 147 Or. 89, 30 P. 2d 1041, the issue of defendant's sanity or insanity was recognized and testimony thereon was heard.

In the case of *State v. Lauth*, 46 Or. 342, 80 P. 660, 114 Am. St. Rep. 873, full opportunity was given defendant to introduce evidence tending to show insanity.

In the case of *People v. Northcott*, 209 Cal. 639, 289 P. 634, 70 A. L. R. 806, the court declined to set out the contents of the affidavits upon which defendant

based his request to be permitted to enter a plea of not guilty by reason of insanity. For that reason the writer is unable to treat it as in point in the instant case.

*People v. Morgan*, 9 Cal. App. 2d 612, 50 P. 2d 1061, is a case wherein defendant entered a plea of guilty. Later he was arraigned for sentence whereupon he applied for probation and the matter was continued to June 17, 1935. On June 17, it was again continued until June 24, 1935. On the last-named date, it was again continued to July 1, 1935, to permit defendant to obtain new counsel. Unlike the case at bar, the question was decided upon the facts stated in an affidavit of defendant's son and the reports of two physicians. These facts are very dissimilar to those reflected in the testimony of the instant case. This dissimilarity is so marked that the writer does not deem the case in point here.

The five cases last above cited and distinguished were cited by counsel for the state upon reargument.

While counsel for defendant spoke of desiring to interpose a plea of not guilty by reason of the temporary insanity of defendant, it is obvious that the motion of counsel for defendant was that they be permitted to make a defense upon the ground that defendant was insane when he shot Finkell.

In ruling upon this motion, the court called attention to the fact that jurors, who had been accepted, were not interrogated upon their voir dire as to their attitude toward or experience with the question of insanity as a defense to crime; and assigned that as one reason for denying defendant's motion.

Nothing was said which would indicate that either the District Attorney or the court considered the mo-

tion as one seeking the right to interpose a formal plea of not guilty by reason of insanity. As stated, such a plea is unknown to our criminal procedure.

These facts lead the writer to treat defendant's motions as proffers of proof in support of the contention that at the time of the shooting he was insane.

This is a case wherein the life of defendant is in the balance. In case of a verdict of guilty as charged, the jury, and the jury alone, must determine whether the life of defendant shall be forfeited; therefore, we should withhold the judgment which might well control us in a case involving a lesser penalty, and give a construction to the record which manifestly was the one given by the trial court, namely, that on behalf of defendant there was a request for the privilege of presenting, and an offer to present, the question of defendant's alleged insanity.

The writer is aware that the statute, by its terms, places the determination of such a request within the discretion of the trial court; but he thinks that in the instant case the denial thereof was an abuse of discretion.

Some of the grounds upon which defendant's sanity might be challenged, in addition to those above mentioned, are that on the day of the killing he claimed that, a short time before, he and Keating had had an altercation; that, some time before, some Keating had attacked defendant's brother resulting in the brother's death; and that Keating had placed defendant's sister in a house of prostitution. At the trial, defendant testified that he had never had any trouble with Keating; and he had never heard of his brother having any trouble with Keating, and that none of his sisters was ever in a house of ill fame.

As shown by the testimony of Larry Wong, a very short time before the shooting, defendant was walking down the street holloing, "God damn pimp. God damn pimp."

Witness Scheurer testified that a short time prior to the shooting, defendant came into the place where Scheurer was dealing panquinea and said: "I am out to get some meat." Defendant then left but shortly thereafter returned.

The following is quoted from the testimony of Mr. Scheurer with reference to defendant's second call.

"Mr. Lomax: Was that the first time?

The Witness: No, the second time. He came in and he come up to me and he says, 'Where is your friend?' and I says, 'What do you mean?' I call him 'Curley'.

Q. Who do you call Curley?

A. Mr. Wallace. And he says, 'Where is your friend?' And I says, 'I don't know who you mean?' And he says, 'Well your friend Buster?' He asked me where my friend was and I says, 'Who do you mean?' And he says, 'You know who I mean.' And he says, 'Your friend.' And I says, 'Well Curley, there are lots of them, everybody who comes in this place is my friend.' And he says, 'Well, your friend Buster.' And I says, 'I don't know.' And he started to call me vile names.

Q. Tell the jury what he said and what he did. I know it is unpleasant, go ahead and tell the jury what he said.

A. Well he called me a — — — do I have to use that—?

Q. You will have to tell the jury what it is.

A. Well he called me a dirty ※ ※ ※ ※ ※ and a son-of-a-bitch. And about that time he pulled a gun out and shoved it in my chest.

Q. What did he say when he did that?

A. Well, if I remember right he said, 'I would just as leave get you as my meat as not.'

Q. Then what?

A. Then after he put the gun in my chest—I don't know whether he meant to pull the trigger or not, but I know it scared me at the time; and then he shoved the gun back in his pocket and started to walk out, and then he turned around and called me a dirty * * * * * again and walked out."

The omitted word above indicated by asterisks rendered the appellation twice employed by defendant too vile to print. Attention is directed to it only on the ground that coprolalia is a symptom of some forms of insanity.

On cross-examination, it was developed that Mr. Scheurer had known defendant about a year and that Wallace had been very friendly toward Scheurer and Scheurer considered him as a friend.

From the testimony of Miss Patricia Martin, it appears that immediately before the shooting defendant was using terrible language, and after the deceased remonstrated, defendant started calling deceased "all kinds of names," consisting both of profanity and vulgarity.

When defendant had been intercepted and three men had him in charge, witness Woodrow Wilson, believing defendant was reaching for a gun, struck defendant once or twice on the back of his neck. Defendant testified that he was not aware of those blows.

Besides that, the course taken by defendant as related to witness Mitola in the presence of the officers at the police station after defendant's arrival there

following his arrest, affords material proper for the consideration of a specialist on mental and nervous cases.

Mr. Mitola, a police officer, was asked to tell the jury what defendant said, and in response testified as follows:

"A. When I walked into the room where he was seated, Detective Brian was with him. As soon as I walked into the room he seemed very angry, and he used profanity toward me, and I couldn't understand why, because I had not talked to him prior to that time, and then for a few moments later on we did not bother talking to him—until he had a chance to cool off a little bit, and finally when he had straightened out to a certain extent we started questioning him about this incident, and his story —he was going to tell us the whole thing, and he related a story about an incident that occurred several years ago, several years back, in which his brother was involved in a fight in a card room, and a party by the name of Blondie Keating was one of the men involved in this incident, and there were two other fellows which resulted in the defendant's brother's death. That is the story he told us at the time; and the night previous to the shooting he had been in a card room at Kelly's Olympian on Washington Street, between Fifth and Sixth Streets, and he had been in a card game, and one of these Keatings—and we later found out he meant Buster Keating—was in the card game; and so he told us he became involved in an argument with Keating, and Keating became quite abusive, and so he left the card room. And the next day he got to thinking about this argument, and also about the incident that occurred several years back, and he got to drinking, and the more he thought about it the madder he got, and the more he drank. And he thought he would go out and look for Keating. And before doing this he went up to his room and

had some drinks there, and he had a gun in his room, which we found out was a .38 super-automatic. He took this gun to the basement of the hotel in which he was staying and practiced with that two or three times, and the gun jammed on him, so he took it to Semler's Pawn Shop on Southwest Third and Washington Streets and traded the gun for the gun we have here, and he then went back to the hotel and used that again in the basement to see if it worked, and after doing this he put the gun in his pocket, and stated he walked up the street, and he was looking for one of the Keatings. And during the afternoon of this particular day he stated he had been drinking and going into doorways, and had been in the Basket Grocery and purchased a bottle of wine, and had that and he had a few glasses of beer, and walking down the street in front of the Knotty Pine, he stated the deceased, Finkell, jumped out of the car, although he didn't know it was Finkell at the time, and he just shot.''

The crucial question, as the writer views it, is whether the defendant should have been permitted to introduce evidence and present argument in support of his theory that at the time of the commission of the crime he was suffering from the kind and degree of insanity which constitutes a defense, or would be found to render him incapable of premeditation and deliberation, or, in case of a verdict of guilty as charged, would have induced the jury to recommend life imprisonment as the punishment.

This procedural question, which is presented, arises by reason of the statute enacted in 1937 (Oregon Laws, 1937, pp. 22, 23, ch. 18) which is as follows:

"All matters of fact tending to establish a defense to the charge in the indictment or information, other than those specified in the third subdivision of section 13-840'' [Oregon Code 1930 same being section 26-841, O. C. L. A., and having reference to

the plea of former conviction or acquittal] "and except as herein provided, may be given in evidence under the plea of not guilty; provided, however, that where the defendant pleads not guilty and purposes to show in evidence that he was insane or mentally defective at the time of the alleged commission of the act charged, he shall, at the time he pleads, file a written notice of his purpose; and provided further, that the defendant may file such notice at any time thereafter but before trial when just cause for failure to file the same at the time of making his plea shall be made to appear to the satisfaction of the court. If the defendant fails to file any such notice he shall not be entitled to introduce evidence for the establishment of such insanity or mental defect; provided, however, that the court may, in its discretion, permit such evidence to be introduced where just cause for failure to file the notice has been made to appear." Sec. 26-846, Vol. 3, O. C. L. A., pp. 335 and 336.

This case presents to the writer a record from which no other conclusion can be derived than that at the time of the commission of the act charged, defendant's mind was unbalanced. It must be remembered that the state produced the record which reflects that irrational state on defendant's part.

The state contends that defendant's mental disturbance was caused by voluntary intoxication and hence cannot be treated as a valid defense herein. The writer is of the opinion that the state necessarily presented evidence of some character of insanity.

In an early case, the Supreme Court of the United States used the following language:

"The causes of insanity are as varied as the varying circumstances of man.

'Some for love, some for jealousy,
For grim religion some, and some for pride,

Have lost their reason; some for fear of want,
Want all their lives; and others every day,
For fear of dying, suffer worse than death.'

When we speak of the 'mental' condition of a person, we refer to his sense, his perceptions, his consciousness, his ideas. If his mental condition is perfect, his will, his memory, his understanding are perfect, and connected with a healthy bodily organization. If they do not concur, his mental condition is diseased or defective.

\* \* \* \* \* \*

That form of insanity called impulsive insanity, by which the person is irresistibly impelled to the commission of an act, is recognized by writers on this subject. It is sometime accompanied by delusions, and sometimes exists without them. The insanity may be patent in many ways, or it may be concealed. We speak of the impulses of persons of unsound mind. They are manifested in every form,—breaking of windows, destruction of furniture, tearing of clothes, firing of houses, assaults, murders and suicides. The cases are to be carefully distinguished from those where persons in the possession of their reasoning faculties are impelled by passion, merely in the same direction." *Mutual Life Insurance Co. v. Terry*, 82 U. S. (15 Wallace) 580, 21 L. Ed. (U. S.) 236, 239.

There is a species of temporary insanity known as mania a potu. It is induced by an excessive and protracted indulgence in the use of intoxicating liquors. *State v. Hurley*, Houston's Delaware Report of Criminal Cases, 28, 35.

"\* \* \* Men who are addicted to drink, from excessive indulgence become subjects of a disease which medical men designate or speak of as dipsomania or alcoholism. It often-times develops into what is called by them mania a potu, wherein

the patient becomes a madman, wholly deprived of all sane reason while the fit is upon him. In that condition, he is not legally responsible for his actions, being treated as insane.'' *State v. Reidell,* 9 Houston (Del.) 470, 14 A. 550.

The writer is aware that in Oregon, the last sentence of the above quotation from *State v. Reidell,* supra, cannot be accepted as an entirely accurate statement of Oregon law. Our statute provides that

''When the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven beyond a reasonable doubt; and no act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'' Vol. 3, O. C. L. A. 349, section 26-929.

For the purpose of this case, it may be said that murder in the first degree consists of purposely and of deliberate and premeditated malice killing a human being. Vol. 3, O. C. L. A. p. 15, section 23-401.

The mental reactions of a defendant on trial for alleged murder in the first degree necessarily must be considered by the jury to determine whether deliberation and premeditation have been proven. To the writer, it is plain that where the defendant is incapable of deliberating and premeditating even though his inability to do so is the result of voluntary intoxication, a conviction of the crime of murder in the first degree is not justified.

It is stated in *State v. Trapp*, 56 Or. 588, 109 P. 1094, the fact alone, that one is intoxicated, is not a defense for crime, except that it may be taken into consideration in determining the purpose, motive or intent with which the act is done, otherwise, it is unavailing, unless it results in delirum tremens or other form of insanity.

Notwithstanding the fact, as the writer views the record, that the showing made by the state may be susceptible of no more favorable construction in behalf of defendant than that he was suffering from mania a potu, it cannot be gainsaid that mania a potu is one form of insanity; nor can it be said that the state was unaware of the deduction which could readily be made from the testimony produced by the state that defendant was suffering from that form of insanity namely, mania a potu. Being fully aware from its testimony in the case in chief that at least one form of insanity might properly be deemed to be so proven, the writer thinks that the state was not and is not in a position to require any other or further notice that evidence of the insanity of defendant would be offered by defendant.

In *State v. Trapp*, supra, insanity was not invoked as a defense and hence that case is not in point with respect to the question here involved respecting the propriety of refusing defendant the opportunity to introduce evidence in support of his theory as to the character of defendant's insanity while no restriction was placed upon the state with reference to the testimony it tendered bearing upon its contention; and notwithstanding the fact that an instruction was given by the trial court upon the subject, not only of drunkenness but of insanity. In a word, the only parties to the

trial, who were not permitted to say anything to the jury thereon, were the defendant and his attorney.

*State v. Trapp*, supra, is not in point here for two other reasons. One of those reasons is that the facts are widely different in that case from the instant case and the other reason is that in the Trapp case the trial resulted in a conviction of murder in the second degree, while here the verdict was guilty of murder in the first degree without fixing the penalty of life imprisonment.

During the oral argument upon the second hearing, it was insisted by the counsel for the state that the record discloses no evidence of insanity, but does show drunkenness on defendant's part; and with equal emphasis it was asserted by defendant's counsel that there is no evidence in the record of drunkenness, but only of insanity.

In the opinion of the writer, there is evidence of intoxication and the writer also thinks that the nature, extent and result of defendant's intoxication was a matter upon which defendant as well as the state had a right to be fully heard both by the introduction of testimony and by argument of counsel.

"The rule which refuses to recognize intoxication, or temporary insanity resulting from it, as a defense to crime or tortious acts, does not extend further, for it is well recognized that, where the intoxication has resulted in settled insanity of a more or less permanent nature, it will excuse crime committed under its promptings. It has therefore become important to know just where temporary insanity, as the term is here used, resulting from the recent voluntary use of ardent spirits, ceases, and settled alcoholic insanity, growing out of it, begins.

Some of the earlier decisions seem to hold that, where the intoxication affects the understanding of the inebriate to that extent that he can no longer entertain a criminal motive, it has become legal insanity, and may be pleaded as a defense to crime. But a different rule is now recognized by the courts of Texas and by those of the American states at large. It is recognized: (1) That a species of temporary insanity may be produced by long and continued use of intoxicants, in which state the person's mind is temporarily so affected that it is incapable of knowing the right and wrong of his acts. This condition of the mind is the direct result of the voluntary act of the defendant, in becoming intoxicated, and will not excuse crime, except to reduce the degree of murder and show the lack of a necessary intent, as we have seen supra. (2) The continued use of intoxicants may result in the breaking down of the brain and nerve cells, so as to bring about a derangement of the mind, which continues after the mere temporary effect of the ardent spirits has passed off. This condition is variously known as delirium tremens, dipsomania, alcoholic dementia, and mania a potu. Control over the derangement has at this point passed beyond the volition of the person affected, and has become an involuntary result of the intemperate act. This is what is sometimes known as settled alcoholic insanity, and it is well recognized as a form of legal insanity, in the sense that it will excuse criminal acts committed under its influence.'' Law of Insanity, Smoot, Sections 63 and 64, pp. 40 and 41.

''From a strictly scientific viewpoint, every inebriety is a mental disorder and is therefore pathological; consequently the expression 'normal inebriety' is really a contradiction in adjecto. But for practical and more especially for forensic reasons, it is advisable that a differentiation between normal and pathological inebriety should be made.

A pathological state of inebriety is one that is accompanied by pathological manifestations which

are not typical of a simple state of intoxication. It may be produced by very large quantities of alcohol, or, when an intolerance to alcohol exists, by small or medium amounts. It occurs solely upon the basis of a psychopathic constitution, congenital or acquired.

It is above all the degenerate, feeble-minded, epileptic, hysteric, neuroasthenic, paretic or senile patient who is subject to such pathological state of inebriety. They manifest themselves in a sudden pronounced affects with motor discharges of blind rage, in deep depression accompanied by vivid feelings of fear, in stormy mania-like excitement, confusion with sense deceptions, delusioned notions and false recognition of persons, as well as in other psycotic states usually of short duration. After the attack, a deep sleep often supervenes and upon awakening the memory for the events that have been experienced is usually defective. Sometimes complete amnesia exists.

These states of pathological inebriety are of great forensic importance and for this reason the physician must be conversant with them. Many of the so-called alcoholic crimes, injury to person, homocides and suicides, take place in the affect of fear that accompanies a pathological state of inebriety. To know this is quite as important for the jurist as it is for the physician." The Unsound Mind and the Law, Jacoby, pp. 28, 289.

"Dr. Charles Mercier says that 'there is no form of insanity that may not be simulated by a case of drunkenness; and when it is not known, from other sources of information, that these manifestations are due to drink, no expert in the world, however skillful, could distinguish between the insanity that is due to alcoholic poisoning and the insanity that is due to other causes.'

Insanity from which a person is suffering may be the transient insanity of drunkenness or the permanent insanity of general paralysis; but if the

manifestations of drunkenness be identical with those of insanity, it might with reason be stated that the drunkard so long as he is drunk, is mad. In other words, it is strictly and literally true that when, and in so far as, a man is intoxicated by alcohol, then and to that extent, he is insane. Yet, inasmuch as the cause is obvious, the condition temporary, and as the manifestations of the insanity as a rule differ somewhat from those in insanity due to other causes, the insanity due to acute alcoholic poisoning is not usually regarded as lunacy. It is called by a different name, and is considered a different thing, but in essential nature the two are identical.

Dr. Charles Mercier refers to the similarity in regard to effect upon the mind between drunkenness and insanity in the following words:—

'That the resemblance of the manifestations of drunkenness to those of insanity means a real identity in nature between the two conditions, and is not merely a farfetched analogical resemblance, is shown by two circumstances; first, that there is a well-marked and distinct variety of insanity which reproduces with minute faithfulness the characteristic signs that ordinary cases of drunkenness display; and second, that every form of insanity is reproduced with accurate simulation by some case of drunkenness.' " Thesis Upon Insanity and Mental Deficiency in Relation to Legal Responsibility by William G. H. Cook, LL. D. (Lond) pp. 10 and 11.

From a consideration of the foregoing quotations on the subject of drunkenness and so-called legal insanity, it appears that three postulates are established.

■ That by the symptoms shown by such a state of facts as here disclosed drunkenness cannot be distinguished from insanity. Testimony of continuous and excessive indulgence in alcoholic drinks or testimony of intolerance on defendant's part to alcohol and com-

paratively moderate participation therein may, if believed, support a finding that defendant was insane.

■ That when these symptoms appear in cases not induced by voluntary intoxication, wherein the inability to distinguish right from wrong is shown, a complete defense is established.

■ That where the defendant's mental state be such, even though it be the result of voluntary intoxication, that he is incapable of forming the necessary purpose, being impelled by the alleged motive or entertaining the requisite intent to constitute the crime, he cannot rightfully be convicted of a crime involving such purpose, motive or intent.

From the foregoing premises, the writer is constrained to draw two conclusions: First, that the symptoms of defendant's unbalanced mentality in the case at bar were such that no other notice to the district attorney was necessary that the issue of insanity would arise therefrom than his knowledge thereof gained from the testimony he presented to the court.

And second, that the denial by the court to permit defendant to make whatsoever showing he could on that issue constituted error.

Moreover, the writer is of the opinion that a full and complete showing as to defendant's mental state should have been permitted in order that the jury could determine, not only from the state's testimony thereon which is in the record, but from that and also from such showing as defendant could make therein, what the punishment should be, whether life imprisonment, or death, in case of a conviction as charged.

In the opinion of the writer to conclude in this case that the judgment of death should not be disturbed be-

cause only drunkenness as distinguished from insanity is shown in this record, is to entirely overlook two vital facts. The first of these is that only a study of the defendant's habitual manifestations, environment, social surroundings, normal reaction to alcoholic indulgence, personal experience, especially with reference to its probable effect upon his nervous system and other similar factors alienists consider in determining whether his is a psychopathic constitution, can enable anyone to determine from the symptoms, which are reflected in this record, whether they indicate mere voluntary intoxication on defendant's part or insanity. The second phase of the record, which, in the opinion of the writer, is overlooked or ignored, in thus arriving at such a conclusion, is that the question we are called upon to determine is whether the judgment of death should be carried out in the face of the fact that the defendant was not permitted to make any showing upon the question whether he was merely drunk or was really suffering from some form of mental derangement known to our law as a defense to crime.

The defendant was denied the privilege of presenting any testimony in support of his contention as to the kind of insanity with which he was afflicted. The defendant was without means with which to conduct his defense. He was a swamper in a Chinese gambling establishment. He had had the misfortune to suffer amputation of one hand. The court appointed attorneys to defend him. In their opportunity and ability to prepare a defense, they were restricted to such a showing as could be secured at the expense of Multnomah County.

No one with experience in criminal practice will doubt that if their client had been a man of means, a

much more complete, exhaustive and satisfactory development of the facts in the case could have been secured.

The writer feels justified in quoting an expression made by Miss Florence Elinwood Allen, who is the first woman to sit in a court of general jurisdiction, and also the first woman to sit in a court of last resort in the United States. This expression is one Judge Allen made while a member of the Supreme Court of Ohio. It is as follows:

> "We do not deem it necessary under this record to consider the refusal of the court under Section 13440-2, General Code (113 Ohio Laws, 175), to permit testimony to be offered as to the insanity of the accused at the time of the commission of the offense, nor to go into the question of the grave doubt as to the constitutionality of the provision establishing a conclusion presumptive of sanity from the failure of the attorney to file a written plea of not guilty by reason of insanity. Two of the members of this court, including the writer of this opinion, are convinced that an enactment which would deprive an insane person of a defense going to the very vitals of his case, because of non-action on the part of his attorney, would necessarily be unconstitutional, upon the ground that it would deprive such insane person of due process of law." *Evans v. State*, 123 Ohio St. Rep. 132, 138, 174 N. E. 348.

Equality before the law is one of the basic principles of this truly great government of ours. It is the fixed opinion of the writer that the defendant in this case did not have an opportunity to present his defense equal to that which would have attended a more affluent defendant. By that is meant not that affluence or its absence motivated the trial court, but only that dependence upon the public funds administered by

prudent and economical public officers serves as a serious handicap to preparation of a defense based upon insanity, especially in such a sordid case as this. Giving a strict construction to the course taken by defendant at the trial which the writer construes as an offer of proof, it must be conceded that as to procedural law no discrimination against him is apparent; but construing the course taken by defendant as the writer construes it and as the trial court construed it, namely as an offer of proof of insanity, both for defense and mitigation, the writer can come to no other conclusion than that defendant was denied the right given to him by substantive law which entitles him to be fully heard upon the only defense he had. The writer thinks that, especially in a capital case, procedural law should not be permitted to prevent substantive law from being available to the defendant.

Under the substantive law, such a showing as defendant may have made might have completely refuted the contention of the state that defendant was only voluntarily intoxicated.

In the opinion of the writer, while the strict rules governing the defense of insanity in this jurisdiction are in force, no one should fear the result of a construction of the 1937 statute, requiring advance notice by a lunatic to the district attorney that the maniac proposes to introduce proof of his insanity, limiting the applicability of such statute to cases where the state does not present proof tending to show that at the time of the alleged crime defendant was afflicted by some degree of insanity.

To say that the state could not have examined the veniremen upon their voir dire, as to their mental reactions in a case involving the act of one suffering from

some form of the many forms of insanity, even though no notice had been given of an intention on the part of the lunatic to rely upon insanity as a defense, does not appeal to the writer to be justified.

The writer is well aware that in passing upon the question of the sanity or insanity of a person, alienists do not consider mere symptoms as decisive, but they do recognize them for what they are, namely, symptoms of mental derangement. We of the laity should do the same. To summarize the symptoms of an unbalanced mind shown in this record as manifested by defendant, we find a subject belonging to a class more apt to be afflicted with a psychopathic constitution than those in a higher stratum of society. Defendant was a swamper in a Chinese gambling resort. We find that he had been maimed by having his left hand amputated. It is true, nothing appears as to the result of this upon his nervous system but common sense tells us that it must have been a great shock thereto. We find that he had delusions, nonexistent injuries to his family and imaginary affronts to himself were real to him. He responded to alcohol, if we confine ourselves to what is shown here, as one who had an intolerance thereto, namely, one who may become demented by a comparatively moderate participation therein. This, it is true, may not have been a fact. Defendant may have been addicted to excessive and long continued use of liquor. In either case, we have a symptom of insanity. He manifested coprolalia while with Scheurer, again while walking with Larry Wong, again at the scene of the crime, and then after his arrest while at the police station. He was unable to distinguish between his intended victim and a stranger; he was beaten about the head, but was oblivious of the fact; his features were

alternately flushed and pale. He had no motive for assaulting Scheurer or for indicating that he was in quest of meat; or, because of that, Scheurer his friend would as well suit him in that regard as anyone; he had no motive for killing Finkell. A state of confusion attended him after his arrest and when officers interviewed him.

Some of these symptoms were not known to his counsel before trial, but all of them were known to counsel for the state.

The state was fully aware that its case could not be presented without showing that the defendant was mentally unbalanced. Certainly a written notice that defendant would attempt to prove that fact would not have any more effectually apprised the state that the question of the nature of defendant's mania was necessarily involved. The state properly invoked the rule that voluntary intoxication alone is not a defense, but from this record, because the defendant was not allowed to present his defense, only divine omniscience could determine whether defendant's mental disturbance was not the result of other causes than voluntary participation to excess in the contents of the flowing bowl.

Supported by the case of *Mutual Life Insurance Co. v. Terry*, supra, Mr. Smoot says:

"Any cause, then, that tends to disturb or irritate the brain, or the delicate nerve system connected with it, may produce a disturbance of the brain that will result in derangement." Smoot's Law of Insanity, p. 75, Section 118.

The defendant had had the misfortune to suffer amputation of his left hand. While instances of insanity, following surgical operations are said to be somewhat rare, the mechanical shock to the nervous system, es-

pecially in the case of an unstable subject, and the effects of the anaesthetic are elements to be considered. Dr. Henry J. Berkley's Article on Mental Diseases, Etiology Vol. VI, References Handbook of the Medical Sciences, p. 392, at p. 400.

The writer does not mean that the result of a single case of voluntary intoxication alone, no matter how seriously it impairs the mental processes, may be considered as a defense to crime.

The writer has given the foregoing outline, because he thinks that, if it had been supplemented by the evidence that defendant's counsel sought to introduce and also subjected to their argumentative analysis, the jury would have been warranted in finding defendant's mental impairment worthy of more consideration than they actually gave it either in determining the question of his guilt or innocence, or the degree of his guilt, or the character of punishment to be inflicted in case the jury found him guilty as charged.

It is apparent to the writer that the opinions of specialists upon mental and nervous diseases, based upon hypothetical questions framed from such evidence as defendant as well as the state might produce, and subjected to cross-examination and argumentative analysis, would have been of value in determining whether at the time of the tragedy defendant could have been sane.

There is authority to the effect that the general trend of modern psychiatric opinion is that, in most instances, the tendency to excessive indulgence in alcoholic drinking is a symptom rather than a cause of mental disorder. Singer and Krohn's Insanity and Law, p. 104.

It is argued that defendant's motion which was understood by all concerned to be a request that defendant

be permitted to introduce evidence of insanity, was properly overruled because the record in its present state, does not disclose sufficient evidence of defendant's mental derangement to constitute such insanity as, under the very strict test imposed in this jurisdiction, constitutes a complete defense. To the writer, this argument is not convincing. It is like cutting off a dog's tail and then beating the dog because his tail is shorter than it would have been if it had not been bobbed. Under those circumstances, the unfortunate canine is not to blame because his severed appendage is a non sequitur.

Sympathy has no place here, but the principle of equal rights before the law is vital. To displace the right to a fair trial before an impartial jury by substituting therefor the report of a psychiatrist, based upon a partial showing, submitted only to the trial judge with no opportunity for cross-examination, or for the jury to see or hear the person making the report, or to pass upon the question said to have been decided therein, is, in the judgment of the writer, a deprivation of the right of trial by jury.

Statements made by the district attorney, while not evidence, certainly disclose that the district attorney, who is the representative of the state, had in his own mind the condition of defendant's mind as reflected by what the district attorney told the court and the jury that the defendant had said and done.

It is elementary that the law does not require a vain thing. To the writer, it is unreasonable to hold that the law requires a defendant to tell the district attorney in a formal, written, legal motion, supported by an affidavit, that the course taken by the defendant is such as to indicate serious mental disturbance, which in all fairness to the state, as well as to the defendant, justi-

fies a submission to the jury of the question of the extent and character of such irrationality, when the district attorney himself states to the jury as a fact and to the court in chambers, even if inexactly, that the defendant took a course which would not be, and never has been taken by a human being in a normal state of mind. In my view, the district attorney was fully apprised of everything that the most formal document on earth could evidence that the mental condition of defendant was irrational; that no man in possession of proper reasoning faculties would be guilty of doing and saying that which the district attorney said the defendant had done and said.

If the district attorney knew those things, the writer can find no reason for a written or other notice to the district attorney that they were in the case for the consideration of the jury.

*State v. Flanney*, 61 Wash. 482, 112 P. 630, resulted in a conviction of murder in the second degree. The issue of insanity was submitted. The judgment was reversed because the court did not properly restrict the evidence of insanity to determining the mental state of defendant rather than as a justification for the crime.

In *State v. Peare*, 113 Or. 441, 233 P. 256, the issue of insanity was submitted to the jury.

The writer does not think that the fundamental question here is whether it is the duty of the court to submit the issue of insanity as a defense whenever specific instances of strange, irrational or depraved conduct are made to appear in the state's evidence.

The fundamental question, as the writer views it, is whether the state is entitled to a written formal motion with supporting affidavit at the hands of defendant, asking to submit defendant's showing upon the ques-

tion of defendant's irrationality when it is clear that the state is fully apprised that defendant acted irrationally.

As the writer views the record in this case, it does not present the question of the duty of the court with respect to any particular course of conduct on defendant's part in determining whether to submit the question of his mental state to the jury, but only the question whether a written notice, a written motion and a formal written showing by defendant craving permission to be heard on that question should have been required. It was required and as far as this record is before us, if that requirement had not been imposed, no one can tell whether the record would disclose only strange, irrational or depraved conduct on the one hand, or, on the other, the character of insanity which is recognized even in Oregon as a defense or such a mental defect as to require a withdrawal of the first degree murder charge, or as to induce a recommendation of life imprisonment.

The writer cannot concur in the doctrine that the courts should not look to psychiatry for guidance in determining the mental condition of a defendant when such condition is in issue. To the writer, such a recourse is as proper as recourse to anatomy and physiology in determining the physical condition of a person.

It is to be noted that the majority opinion gives value to a purported report of an eminent psychiatrist, when the consideration of it is confined to the judge of the trial court. The writer has never seen that report. It is no part of the record. The majority hold that upon examining that report the court was justified in concluding that defendant's counsel had fully explored the matter of defendant's condition and had deliberately

omitted to raise the issue. The writer has great respect for learned psychiatrists and for the somewhat modern development of the science of psychiatry, but cannot concur in holding that the inspection of the report of one psychiatrist justifies the conclusion that defendant's attorneys knew what as attorneys they disclaim knowing, and that being fully advised they had taken a course deliberately which they say was based upon only a partial knowledge of their client's case.

As the writer understands their opinion, the majority insist upon determining whether the specific instances of irrational conduct appearing in the state's case required a submission of insanity as a defense under instruction of the court.

That question is not properly here, however, for the defendant was not permitted to direct the court's attention to anything pertaining to that issue. He was prevented therefrom because the court thought that he should have first filed a motion, supported by affidavits, accompanied by a formal written notice to the district attorney.

In *State v. Grayson*, 126 Or. 460, 270 P. 404, this court had the full record before it. No contention appears there that defendant in presenting his case was limited or restricted.

In *State v. Murray*, 11 Or. 413, 5 P. 55, this court had the entire record. The evidence on the issue of insanity excluded by the trial court was not admissible and that admitted, while not entirely conformable to approved procedure, was deemed harmless. The controlling question in the case at bar was not presented in the Murray case, namely, the right of defendant charged with a capital offense to present the defense of insanity, when the state knew of defendant's irrational conduct, but

his counsel were less fully informed thereon and therefore had not given the statutory notice of an intention to interpose such defense.

In *State v. Zorn*, 22 Or. 591, 30 P. 317, no exception is presented because the defendant was restricted in presenting his defense. The instructions of the court were excepted to but held proper.

The writer is of the opinion that the greater includes the lesser. If circumstances of mitigation are included in defensive testimony, which has been rejected by the court, to the writer, it seems to be hypercritical to say that the distinction between defensive matter and matter in mitigation is such that no error was committed by the rejection of such matter.

Moreover, the writer thinks that any evidence which will reduce the charge from murder in the first degree to murder in the second degree, is, as to the graver charge, defensive. It may be said that evidence which would induce the jury to recommend life imprisonment in its verdict of guilty as charged is not defensive, but merely mitigating. ''In view of the sacredness of life, and the protection which the law throws about it,'' the writer cannot bring himself to approve the course taken which prevented the defendant from making whatever showing he may have had to that end, whether it be defensive, pro tanto defensive, or in mitigation.

Modern practice is showing more and more of a tendency in civil cases to have a full disclosure by all parties of the available evidence to the end that the truth may be known. The writer thinks that it is even more important that criminal procedure conform to this modern practice. The trial of a case involving the death penalty should not be a game, but an earnest effort to ascertain the truth. Not the slightest reflection

is here intended upon the learned and able trial judge. The writer knows from experience the stress which is upon the trial judge especially in a capital case. Many times his work and responsibility is severely augmented by incomplete preparation on the part of counsel. The writer knows that in this case the trial judge acted conscientiously and wholly in the manner in which he deemed his duty to demand. So too of the learned and distinguished associates of the writer with whom the writer finds himself unable to agree. Their motives are above reproach and they are as conscientious as anyone could be in this and all other cases. The writer would be untrue to himself, however, if he permitted this case to be affirmed without voicing his dissent.

When as shown by this record the district attorney has knowledge of admitted irrationality on the part of the defendant to the extent that he consents to the appointment of a psychiatrist to report upon the mental state of defendant at the expense of the county, to say that to permit defendant to amplify the fact concerning his mental state within the approved rules governing the admission of testimony, would constitute a trap for the prosecution, does not appeal to the writer as justified.

What more actual notice could be given does not appear. The writer thinks that from the statement of the district attorney, from his consent to an examination by a psychiatrist and from his knowledge of the evidence he introduced on the trial, he received not only notice but knowledge that the issue of defendant's mental state would necessarily obtrude itself.

The writer has ventured to suggest that greater difficulty attends the preparation of a defense where the defendant, because of his poverty, is dependent upon

the consideration of faithful economy enforcing public officials than in a case where the defendant is affluent. We are told—"but not by counsel"—that such a state of affairs is not worthy of consideration, because the defendant had a fair trial. Such reasoning would prevent a consideration of any assignment of error. All that would need to be said in answer is that the error is of no consequence because the party making it had a fair trial. In the writer's school days such reasoning was labelled *circulus in probando* or *petitio principii*. The writer is of the opinion that this is a case where the handicap of dependency upon the further expenditure of public funds proved to be a very apparent deterrent to counsel, appointed by the court to serve at public expense in their preparation of the defense.

What the writer has attempted to express is that in his opinion under the facts of this case, it being one wherein human life is in the balance, the statute should be construed in such a way that a jury, not the trial judge, nor the judges of this court, but the jury may pass upon the question whether defendant's admitted irrationality was of the character which constitutes a legal defense or a mitigating circumstance; and that, because the state was at all times aware of defendant's irrationality, no formal, written or extended, or specific notice thereof to the state should be required to the effect that the defendant would seek an opportunity to present his side of the question as to the nature of defendant's mental affliction.

The state had its day in court on that issue and contended that it was merely a case of voluntary drunkenness which is not a defense in cases of manslaughter or murder in the second degree. The defendant was precluded from presenting his version, which was twofold,

first, that it was of such character of insanity that constitutes a complete defense, and second, if it could not be so considered, then, it would serve to rebut the state's showing that defendant's mental condition was such that he was able to premeditate and deliberate upon the commission of the crime charged. Certainly, if he could not deliberate and premeditate, he would not be guilty of murder in the first degree.

The writer is completely at a loss to understand why, if the issue of insanity of defendant was not in the case, an instruction to the effect that to be a defense intoxication must result in some form of insanity and in such a case the burden is upon the defendant to prove such fact beyond a reasonable doubt as in other cases of insanity.

On the one hand, the defendant was deprived of introducing any proof upon the issue, and on the other, was confronted by an instruction that the burden was upon him in respect to that issue, and, unlike all the other issues, his proof on that issue must convince the jury beyond a reasonable doubt.

The writer can give that instruction no other meaning than that in the mind of the trial judge the issue of insanity was in the case as a feature of it which demanded an instruction differentiating and distinguishing it from all the other issues the affirmative of which was with the state, while upon the issue of insanity, the defendant had the affirmative; and, while with respect to all other issues the defendant should prevail if the evidence left a reasonable doubt in the minds of the jurors, but with respect to the defense of insanity in order to prevail the defendant must prove it beyond a reasonable doubt.

To give an instruction upon a question not within the issues is error. The writer thinks insanity of de-

fendant was within the issues of the case at bar and is not saying that it was error to instruct upon it.

The writer thinks that it was unfair to permit the state to have its say upon the issue of insanity both on the witness stand and in the opening statement to the jury, and for the trial judge to instruct upon it; and to deny the defendant the right to introduce proof or argue the question simply because he did not give a written, formal notice that he would contend that his insanity was of such a character as to constitute a legal defense.

The opinion of the majority in support of its position that the record before us does not establish such a character of insanity as to constitute a complete defense, calls special attention to the fact that the circumstances attendant upon the amputation of defendant's hand are not in the record, that his conduct, manner of life and mental reactions at other times than upon the day of the tragedy are not before us, that no one was asked whether he was sane or insane, and that no expert testimony was adduced on that issue. The writer is of the opinion that if defendant's counsel had attempted to make any such showing after the decision by the trial judge twice expressed that he should not do so, he would have been in contempt of court.

To the writer, to base an affirmance upon the absence of proof which the trial court twice held should not be offered is too much like placing an effective gag in a man's mouth and then breaking his neck because he does not talk. Either gagging him is reversible error or fracturing his cervical vertebra, because of the result of such gagging, should be so considered.

The writer cannot agree with the majority in holding that defendant's contentions are based solely on the state's evidence.

In concluding this dissenting opinion, he ventures to repeat portions of the statement of defendant's counsel to the court when permission was sought to present the defense of insanity.

"From the statements made by the district attorney, some of the statements made by the district attorney, can be explained only by the defendant through evidence offered as insanity. We ask the court to exercise its discretion at this time and *permit us to introduce testimony* of that nature."

\*       \*       \*       \*       \*

"The only opportunity we wish in the trial is not to be curbed in any way on the introduction of *evidence that we have now to controvert evidence that the district attorney has to offer.*" [Italics supplied.]

Certainly evidence in behalf of defendant controverting the state's evidence is not synonymous with the state's evidence. In that respect the contention of defendant, as the writer understands it, is that error was committed in refusing to permit defendant to introduce evidence of insanity, to cross-examine and be otherwise heard thereon. It is not urged by defendant, nor by the writer, that the trial court committed error in construing the state's evidence to be such as to require the jury to be told in effect that the defendant held the affirmative of the issue upon the question of defendant's insanity and that defendant could prevail on that issue only by convincing the jury beyond a reasonable doubt that at the time of the tragedy he was insane. The writer is aware, however, that such construction of the state's evidence is contrary to that of the majority of this court. In the opinion of the majority, as the writer understands it, we must say that the state's evidence does not convince us beyond a reasonable doubt, and did not so convince the jury, that defendant was insane;

hence the defendant was not prejudiced by being denied the right to be heard by counsel on the issue of insanity, the right to cross-examination thereon, and the right to introduce evidence which defendant then had on that issue.

The writer most respectfully, but, nevertheless, emphatically declines to say anything of the kind.

The writer disclaims any intention of suggesting that this court should determine any of the issues in this case. The issues of fact should be determined by a jury. To hear only the state's evidence upon obviously the most important defensive issue and the instruction of the judge as to the law applicable thereto without permitting the defendant to introduce testimony or submit argument upon that issue is not fair to the jury, the defendant, the administrative officers, or the public.

For these reasons, the writer dissents.

Mr. Justice BELT and Mr. Justice RAND concur in the foregoing dissenting opinion.